1  STEPHEN R. HARRIS, ESQ.
2  Nevada Bar No. 001463
   HARRIS LAW PRACTICE LLC
3  6151 Lakeside Drive, Suite 2100
   Reno, NV 89511
4  Telephone:  (775) 786-7600
5  E-Mail: steve@harrislawreno.com

6  JOHN ECHEVERRIA, ESQ.
   Nevada Bar No. 200
7  ECHEVERRIA LAW OFFICE
   9432 Double R Blvd.
8  Reno, NV  89521
   Telephone:  (775) 786-4800
9  Facsimile: (775) 786-4808
   email: je@eloreno.com
10 Attorneys for Trustee/Third Party Plaintiff
11

12              UNITED STATES BANKRUPTCY COURT

13               FOR THE DISTRICT OF NEVADA

14                       * * * * *

15 IN RE:                          Case No.: BK-12-51014-btb
                                   (Chapter 7)
16 NATHAN L. TOPOL, an individual,

17              Debtor.
   _____/
18 CITIMORTGAGE, INC., a corporation,
                                   Adversary Case No. 15-05015-gwz
19              Plaintiff,

20 v.
                                   **TRUSTEE'S STATEMENT OF**
21 W. DONALD GIESEKE, Trustee of the  **UNDISPUTED FACTS IN SUPPORT OF**
   NATHAN L. TOPOL bankruptcy estate, et  **MOTION FOR SUMMARY JUDGMENT**
22 al.                              **OR PARTIAL SUMMARY JUDGMENT**
                                   **AGAINST CITIMORTGAGE, INC.'S**
23              Defendants.        **COMPLAINT**
   _____/
24 W. DONALD GIESEKE, Trustee of the
   NATHAN L. TOPOL bankruptcy estate
25
                                   **Hrg. Date:    December 15, 2016**
26                                 **Hrg. Time:    2:00 p.m.**
              Third Party Plaintiff,  **Est. Time:    2 hours**
27 v.                              **Set By:       Calendar Clerk**
28

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

                              1

1    STEWART TITLE OF PLACER, a
     California corporation, fka SIERRA
2    VALLEY TITLE COMPANY, and its
     successors,
3
4              Third Party Defendant.
5    _____/

6         COMES NOW Defendant/Third Party Plaintiff W. Donald Gieseke ("Trustee"), by and

7    through his attorneys, STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC, and

8    JOHN ECHEVERRIA, ESQ. of ECHEVERRIA LAW OFFICE, and files the following

9    Statement of Undisputed Facts pursuant to LR 7056(a).

10        1.     Certain real property located at 4250 W. Lake Blvd., Homewood, California

11   96141 ("Real Property") was 11 U.S.C. §541 property of the bankrupt estate of Nathan L. Topol

12   ("Debtor") effective as of the Petition Date of May 1, 2012.  On November 19, 2015, the

13   Trustee sold the Real Property pursuant to an order of this Court, and the sum of $6.2 Million

14   has been held by the Trustee in a segregated bank account pending outcome of this adversary

15   proceeding. (Declaration of Stephen R. Harris, Esq.)

16        2.     A Deed of Trust was recorded on October 16, 2002, in Placer County, California,

17   as Document No. 2002-0125157 against the Real Property, naming the Borrower as Nathan L.

18   Topol, a married man as his sole and separate property, and naming Citibank, F.S.B. as the

19   Lender.  The Deed of Trust indicates in the upper, left hand corner, that the recording was

20   requested by Sierra Valley Title Company, and "when recorded mail to: Citibank, F.S.B., c/o

21   CitiMortgage, Inc., P.O. Box 9206, MS 81026, Farmington Hills, MI 48333-9206."   The Deed

22   of Trust indicates Sierra Valley #34-506527 NM also in the upper left hand corner.

23   (Declaration of Stephen R. Harris, Esq., at Exhibit A).

24        3.     A Full Reconveyance was recorded on January 12, 2004, in Placer County,

25   California, as Document No. 2004-0002629. The Full Reconveyance states that it reconveys all

26   the estate, title and interest under the Deed of Trust executed by Nathan L. Topol, a married

27   man as his sole and separate property, and recorded December 16, 2002 as Serial No. 2002-

28   0125157. The Full Reconveyance was executed by Regina Kay Krahn, Assistant Secretary for

1   Sierra Valley Title Company, and notarized by Cari Lemos on January 6, 2004. The Full
2   Reconveyance references Escrow No. DG-54506527-NM, and Title Order No. 506527. The
3   upper, left hand corner of the Full Reconveyance indicates that the recording was requested by
4   Sierra Valley Title Company, and "when recorded mail to: Citibank, FSB, c/o CitiMortgage,
5   Inc., P.O. Box 9206, MS 81026, Farmington Hills, MI 48333-9206." (Declaration of Stephen R.
6   Harris, Esq. at Exhibit B).

7       4.      Regina Garland is an assistant secretary for SVT. As part of her duties, she
8   handled requests for reconveyances and reconveyances. (Garland Deposition Page 18, attached
9   to Declaration of Stephen R. Harris, Esq. as Exhibit C).

10      5.      As an assistant secretary, the only document she would execute is a full
11  reconveyance. (Garland Deposition Pages 42-43, attached to Declaration of Stephen R. Harris,
12  Esq. as Exhibit C).

13      6.      As an assistant secretary Ms. Garland would sign as many as 20 reconveyances a
14  month. (Garland Deposition Page 43, attached to Declaration of Stephen R. Harris, Esq. as
15  Exhibit C).

16      7.      Before Ms. Garland would sign a full reconveyance as an assistant secretary, she
17  would normally have a substitution of Trustee. (Garland Deposition Page 35, attached to
18  Declaration of Stephen R. Harris, Esq. as Exhibit C).

19      8.      The Full Reconveyance references the date of the Deed of Trust as December 16,
20  2002 which is a typo. The date was really October 16, 2002. (Garland Deposition Page 40,
21  attached to Declaration of Stephen R. Harris, Esq. as Exhibit C).

22      9.      The Full Reconveyance references the correct serial number of the Deed of Trust
23  which supersedes the wrong month. (Garland Deposition Page 40, attached to Declaration of
24  Stephen R. Harris, Esq. as Exhibit C).

25      10.     Ms. Garland's normal procedure for executing a full reconveyance was to have a
26  request for reconveyance signed by the beneficiary. (Garland Deposition Page 49, attached to
27  Declaration of Stephen R. Harris, Esq. as Exhibit C).

28      11.     Ms. Garland would only prepare a substitution of trustee at the request of the

1   lender. Most of the time if there was a substitution of trustee that substituted in Stewart Title, it
2   had been prepared before it got to Ms. Garland. (Garland Deposition Page 69, attached to
3   Declaration of Stephen R. Harris, Esq. as Exhibit C).

4       12.    Ms. Garland testified that she believed documents pertaining to any escrow
5   transaction were stored by SVT for seven years after the date of the transaction. SVT has a
6   small storage area and would send documents to a storage facility at Iron Mountain. (Garland
7   Deposition Page 45 attached to Declaration of Stephen R. Harris, Esq. as Exhibit C).

8       13.    At the time Ms. Garland left SVT, the company was shredding old documents.
9   (Garland Deposition Page 46, attached to Declaration of Stephen R. Harris, Esq. as Exhibit C).

10      14.    Under cross examination by Mr. Demetras, Ms. Garland testified that the
11  documents associated with this loan would have been held at SVT with escrow officer Nicole
12  Miller, and have now been shredded. (Garland Deposition Page 87, attached to Declaration of
13  Stephen R. Harris, Esq. as Exhibit C).

14      15.    Ms. Garland believed the files are legally required to be kept for seven years, and
15  after that time, it is a housekeeping question as to whether to shred them. (Garland Deposition
16  Page 90, attached to Declaration of Stephen R. Harris, Esq. as Exhibit C).

17      16.    The decision of file shredding is made at SVT's main office. (Garland
18  Deposition Page 90, attached to Declaration of Stephen R. Harris, Esq. as Exhibit C).

19      17.    Ms. Garland testified that she spoke with Mr. Harris' paralegal on the telephone
20  and informed her that the the escrow file related to the Citi Deed of Trust and Full
21  Reconveyance had been shredded.  (Garland Deposition Page 91, attached to Declaration of
22  Stephen R. Harris, Esq. as Exhibit C).

23      18.    On June 24, 2014, CitiMortgage, Inc. ("Citi") filed a NOTICE OF INTENT TO
24  SERVE SUBPOENA ON NON-PARTY as Docket No. 905 in Case No. 12-51014-btb.
25  (Declaration of Stephen R. Harris, Esq. at Exhibit D).

26      19.    On June 25, 2014, Stephen R. Harris emailed Eddie Jimenez, Esq., to request a
27  copy of the Subpoena that Citi intended to serve on Sierra Valley Title Company ("SVT").  On
28  June 30, 2014, Mr. Jimenez responded to Mr. Harris via email and included a copy of the

1   Subpoena in his email. (Declaration of Stephen R. Harris, Esq. at Exhibit E).

2        20.    The SVT Subpoena commanded, in part, production "of any and all documents

3   referring and/or relating to the real property located at 4250 West Lake Boulevard, Homewood,

4   CA 96141…". (Declaration of Stephen R. Harris, Esq. at Exhibit E).

5        21.    The SVT Subpoena specifically requested production of all documents referring

6   or relating to the Citi Full Reconveyance, the underlying escrow for the Citi Deed of Trust, and

7   the substitution of trustee for the Deed of Trust. (Declaration of Stephen R. Harris, Esq. at

8   Exhibit E).

9        22.    The SVT Subpoena required production of the documents from SVT by July 8,

10  2014. (Declaration of Stephen R. Harris, Esq. at Exhibit E).

11       23.    On September 5, 2014, Stephen R. Harris, Esq. emailed Eddie Jimenez, Esq. a

12  letter, requesting among other things copies of all documents Mr. Jimenez had received in

13  response to the SVT Subpoena. (Declaration of Stephen R. Harris, Esq. at Exhibit F).

14       24.    On September 10, 2014, Eddie Jimenez, Esq. emailed Stephen R. Harris, Esq.

15  and responded that the Subpoena was served on Sierra Valley Title Company and Mr. Jimenez

16  was advised that all records had been purged.  As a result, no documents responsive to the

17  Subpoena were produced by SVT. (Declaration of Stephen R. Harris, Esq. at Exhibit G).

18       DATED this 3rd day of November, 2016

                    HARRIS LAW PRACTICE LLC
19                  6151 Lakeside Drive, Suite 2100
                    Reno, NV 89511
20                          /s/ Stephen R. Harris
                    By
21                  STEPHEN R. HARRIS, ESQ.

22                  ECHEVERRIA LAW OFFICE
                    9432 Double R Blvd.
23                  Reno, NV 89521
                            /s/ John Echeverria
24                  By
25                  JOHN ECHEVERRIA, ESQ.
                    Attorneys for Trustee/Third Party Plaintiff
26

27

28

1   STEPHEN R. HARRIS, ESQ.
    Nevada Bar No. 001463
2   HARRIS LAW PRACTICE LLC
3   6151 Lakeside Drive, Suite 2100
    Reno, NV 89511
4   Telephone:  (775) 786-7600
5   E-Mail: steve@harrislawreno.com

6   JOHN ECHEVERRIA, ESQ.
    Nevada Bar No. 200
7   ECHEVERRIA LAW OFFICE
8   9432 Double R Blvd.
    Reno, NV  89521
9   Telephone:  (775) 786-4800
    Facsimile: (775) 786-4808
10  email: je@eloreno.com
    Attorneys for Trustee/Third Party Plaintiff
11

12              UNITED STATES BANKRUPTCY COURT

13                FOR THE DISTRICT OF NEVADA

14                      * * * * *

15  IN RE:                          Case No.: BK-12-51014-btb
                                    (Chapter 7)
16  NATHAN L. TOPOL, an individual,

17                    Debtor.
                                        /
18  CITIMORTGAGE, INC., a corporation,   Adversary Case No. 15-05015-gwz

19                    Plaintiff,
20  v.
                                        **DECLARATION OF STEPHEN R.**
21  W. DONALD GIESEKE, Trustee of the    **HARRIS IN SUPPORT OF TRUSTEE'S**
    NATHAN L. TOPOL bankruptcy estate, et **STATEMENT OF UNDISPUTED FACTS**
22  al.                                  **IN SUPPORT OF MOTION FOR**
                                        **SUMMARY JUDGMENT OR PARTIAL**
23                    Defendants.        **SUMMARY JUDGMENT**
                                    /    **AGAINST CITIMORTGAGE, INC.'S**
24  W. DONALD GIESEKE, Trustee of the    **COMPLAINT**
    NATHAN L. TOPOL bankruptcy estate
25

26
                Third Party Plaintiff,   Hrg. Date:   **December 15, 2016**
27  v.                                   Hrg. Time:   **2:00 p.m.**
                                        Est. Time:   **2 hours**
28                                       Set By:      **Calendar Clerk**

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

                            1

STEWART TITLE OF PLACER, a
California corporation, fka SIERRA
VALLEY TITLE COMPANY, and its
successors,

       Third Party Defendant.

_____/

STEPHEN R. HARRIS, ESQ., an individual, under penalty of perjury states as follows:

1.     I am an attorney duly licensed in the State of Nevada. I am the duly appointed general bankruptcy counsel for W. Donald Gieseke, Trustee ("Trustee") of the bankrupt estate of NATHAN L. TOPOL, in Chapter 7 Case No. 12-51014-gwz. The Trustee is also a Defendant and Third Party Plaintiff in the above-captioned adversary proceeding. I am over the age of 18 years, am mentally competent and have personal knowledge of the matters set forth in this declaration. If called upon as a witness, I could and would competently testify to these matters.

2.     Certain real property located at 4250 W. Lake Blvd., Homewood, California 96141 ("Real Property") was 11 U.S.C. §541 property of the bankrupt estate of Nathan L. Topol ("Debtor") effective as of the Petition Date of May 1, 2012. On November 19, 2015, the Trustee sold the Real Property pursuant to an order of this Court, and the sum of $6.2 Million Dollars has been held by the Trustee in a segregated bank account pending outcome of this adversary proceeding.

3.     A Deed of Trust was recorded on October 16, 2002, in Placer County, California, as Document No. 2002-0125157 against the Real Property, naming the Borrower as Nathan L. Topol, a married man as his sole and separate property, and naming Citibank, F.S.B. as the Lender. The Deed of Trust indicates in the upper, left hand corner, that the recording was requested by Sierra Valley Title Company, and "when recorded mail to: Citibank, F.S.B., c/o CitiMortgage, Inc., P.O. Box 9206, MS 81026, Farmington Hills, MI 48333-9206." The Deed of Trust indicates Sierra Valley #34-506527 NM also in the upper left hand corner. A true and correct copy of the recorded Deed of Trust is attached hereto as **Exhibit A.**

4.     A Full Reconveyance was recorded on January 12, 2004, in Placer County,

1    California, as Document No. 2004-0002629. The Full Reconveyance states that it reconveys all

2    the estate, title and interest under the Deed of Trust executed by Nathan L. Topol, a married

3    man as his sole and separate property, and recorded December 16, 2002 as Serial No. 2002-

4    0125157. The Full Reconveyance was executed by Regina Kay Krahn, Assistant Secretary for

5    Sierra Valley Title Company, and notarized by Cari Lemos on January 6, 2004. The Full

6    Reconveyance references Escrow No. DG-54506527-NM, and Title Order No. 506527. The

7    upper, left hand corner of the Full Reconveyance indicates that the recording was requested by

8    Sierra Valley Title Company, and "when recorded mail to: Citibank, FSB, c/o CitiMortgage,

9    Inc., P.O. Box 9206, MS 81026, Farmington Hills, MI 48333-9206." A true and correct copy of

10   the recorded Deed of Trust is attached hereto as **Exhibit B**.

11       4.      On November 25, 2014, I took the deposition of Regina Garland, fka Regina Kay

12   Krahn. A true and correct copy of the transcript of Regina Garland's deposition is attached

13   hereto as **Exhibit C**.

14       5.      On June 24, 2014, CitiMortgage, Inc. ("Citi") filed a NOTICE OF INTENT TO

15   SERVE SUBPOENA ON NON-PARTY as Docket No. 905 in Case No. 12-51014-btb. A true

16   and correct copy of Docket No. 905 is attached hereto as **Exhibit D**.

17       6.      On June 25, 2014, I emailed Eddie Jimenez, Esq., counsel for Citi, to request a

18   copy of the Subpoena that Citi intended to serve on Sierra Valley Title Company ("SVT"). On

19   June 30, 2014, Mr. Jimenez responded to me via email and included a copy of the Subpoena in

20   his email. A copy of my June 25, 2014 email and Mr. Jimenez's June 30, 2014 email, with

21   attachments, are attached hereto as **Exhibit E**.

22       7.      The SVT Subpoena commanded, in part, production "of any and all documents

23   referring and/or relating to the real property located at 4250 West Lake Boulevard, Homewood,

24   CA 96141...". See **Exhibit E**.

25       8.      The SVT Subpoena specifically requested production of "all documents referring

26   or relating to the Citi Full Reconveyance, the underlying escrow for the Citi Deed of Trust, and

27   the substitution of trustee for the Deed of Trust. ...". See **Exhibit E**.

28       9.      The SVT Subpoena required production of the documents from SVT by July 8,

2014. See **Exhibit E**.

10.     On September 5, 2014, I emailed Eddie Jimenez, Esq. a letter, requesting among other things copies of all documents Mr. Jimenez had received in response to the SVT Subpoena.  A true and correct copy of my September 5, 2014 email and letter enclosure (with emphasis added) to Mr. Jimenez are attached hereto as **Exhibit F**.

11.     On September 10, 2014, Eddie Jimenez, Esq. responded to me via email confirming that the Subpoena was served on Sierra Valley Title Company and Mr. Jimenez was advised that all records had been purged.  A true and correct copy of Mr. Jimenez's September 10, 2014 email (with emphasis added) is attached hereto as **Exhibit G**. No documents responsive to the Subpoena issued by Citi were produced by SVT.

DATED this 3rd day of November, 2016

/s/ Stephen R. Harris
_____
STEPHEN R. HARRIS, ESQ.

# EXHIBIT A

RECORDING REQUESTED BY
SIERRA VALLEY TITLE CO.

PLACER County Recorder
JIM MCCAULEY Co Recorder Office
**DOC- 2002-0125157**

Check Number 11330cg
Wednesday, OCT 16, 2002 09:16:41
REC    $17.00 MIC     $3.00 AUT    $15.00
SBS    $14.00

Ttl Pd    $49.00          Nbr-0000708874
                                  rec/R2/1-15

*Sierra Valley # 34-506527 NM*

Recordation Requested by:
Citibank, F.S.B.
12855 North Outer Forty Drive
Saint Louis, MO  63141

When Recorded Mail to:
Citibank, F.S.B.
c/o CitiMortgage, Inc.
P.O. Box 9206, MS 81026
Farmington Hills, MI  48333-9206
Send Tax Notices to:
Citibank, F.S.B.
P.O. Box 790009
Saint Louis, MO  63141

02210722-RR

————————————[Space Above This Line For Recording Data]————————————

Loan No:    6827

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated October 9, 2002, together with all Riders to this document.
(B)    "Borrower" is Nathan L. Topol, a married man as his sole and seperate property.  Borrower is the trustor under this Security Instrument.
(C)    "Lender" is Citibank, F.S.B..  Lender is a Savings Bank organized and existing under the laws of the United States.  Lender's address is 1 Court Square, Floor 20, Long Island City, NY  11120.  Lender is the beneficiary under this Security Instrument.
(D)    "Trustee" is Citibank Service Corp, A California Corporation.
(E)    "Note" means the promissory note signed by Borrower and dated October 9, 2002.  The Note states that Borrower owes Lender Five Million Five Hundred Thousand Dollars (U.S. $5,500,000.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2032.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
C3005 - 01/11/2001          [6827]          Page 1 of 11          Form 3005 1/01
                                                                   Initials:

(F)    "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
(G)    "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H)    "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower:

[X] Adjustable Rate Rider          [ ] Condominium Rider                 [ ] Second Home Rider
[ ] Balloon Rider                  [ ] Planned Unit Development Rider     [ ] Other(s):
[ ] 1-4 Family Rider               [ ] Biweekly Payment Rider

(I)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L)    "**Escrow Items**" means those items that are described in Section 3.
(M)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O)    "**Periodic Payment**" means the regularly scheduled amount due for: (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P)    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q)    "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of PLACER, California:
See Attached Legal

which currently has the address of 4250 West Lake Boulevard, Homewood, CA  96141 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
   2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.
   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.
   3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to

pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower futher agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.



**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

C3005 - 01/11/2001          (6827)                    Page 6 of 11

Form 3005 1/01

Initials: _____

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          *Nathan L. Topol* (signature)                    (Seal)
                                            Nathan L. Topol                                  -Borrower

_____

GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal reads as follows:
Name of Notary Louise Ann Hoyer Barnes
Date Commission Expires 4-14-03
County of Commission Washoe              Commission #
State of Commission NV                   Mfg. ID. #
Signature
10/11/02
Auburn, Ca                               (Firm name, if any)

_____ [Space Below This Line For Acknowledgment] _____

# CERTIFICATE OF ACKNOWLEDGMENT

STATE OF Nevada                          )
                                         ) SS
COUNTY OF Washoe                         )

On October 9, 2002, before me, Louise Ann Hoyer Barnes,                                        ,
personally appeared Nathan L. Topol                        , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature _____

[Notary Seal:
LOUISE ANN HOYER BARNES
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No. 80-68853-2 - Expires April 14, 2003]

                                                                            (Seal)

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
C3005 - 01/11/2001          827)                    Page 11 of 11                    Form 3005 1/01
(c) 2002 Harland Financial Solutions, Inc. All Rights Reserved. SMARTOrigination version 2.9.1.02                    Initials:

Loan No.:                6827

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this Ninth day of October, 2002, and is incorporated into and shall be deemed to amend and supplement the Mortgage, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to Citibank, F.S.B. ("Lender") of the same date and covering the Property described in the Security Instrument and located at:

4250 West Lake Boulevard, Homewood, CA  96141
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of 5.375%. The Note provides for changes in the initial fixed rate to an adjustable interest rate, as follows:

4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of November, 2007, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 875/1000 percentage points (2.875%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-- ONE-YEAR TREASURY INDEX--Single Family--Fannie Mae Uniform Instrument
C3182 - 01/15/2001            6827]                Page 1 of 3                              Form 3182 1/01
                                                                                        Initials:

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.375%** or less than **3.375%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **10.375%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

**1.** Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall be in effect as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2.** When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.



If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
Nathan L. Topol                              -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-- ONE-YEAR TREASURY INDEX--Single Family~Fannie Mae Uniform Instrument
C3182 - 01/15/2001              ,5827]              Page 3 of 3                              Form 3182 1/01
(c) 2002 Harland Financial Solutions, Inc. All Rights Reserved. SMARTOrigination version 2.9.1.02

14

EXHIBIT "A"

The land referred to in this Report is situated in the State of California, County of Placer, and is described as follows:

PARCEL ONE:

Beginning at the Southwest corner of the parcel described hereby, a point on the Easterly line of the California State Highway, said point being identical with the Northwest corner of the property described in that certain Deed to Rhoades, recorded in Volume 882, at page 24 of the Official Records of Placer County, and from said point, the stump of a fir tree marking the meander corner common to fractional Section 36, Township 15 North, Range 16 East, MDB&M and fractional Section 1, Township 14 North, Range 16 East, MDB&M, bears the following two consecutive courses: (1) South 02°39'40" West 160.00 feet and (2) South 07°40'40" West 1628.64 feet; thence along the Easterly line of the California State Highway on the following two consecutive courses: (1) North 02°39'40" for a distance of 98.99 feet , and (2) along the arc of a curve to the right having a radius of 3460 feet, through an angle of 02°54'53" for a distance of 176.01 feet ( said arc being represented by the chord of North 04°07'06.5" East 176.00 feet); thence South 75°07'35" East 338.00 feet; thence South 31°54'39" West 225.00 feet to a point on the North line of the parcel described in the above mentioned Deed to Rhoades; thence North 89°09'10" West along said North line for a distance of 225.00 feet to the point of beginning.

PARCEL TWO:

All that certain strip of land which lies between the East line of the above described parcel and the low water of Lake Tahoe and is bounded by the Easterly extensions of the Northerly and Southerly lines of said parcel.

APN: 085-250-008

# EXHIBIT B

RECORDING REQUESTED BY:
SIERRA VALLEY TITLE COMPANY
AND WHEN RECORDED MAIL TO:

CITIBANK, FSB C/O CITIMORTGAGE, INC.
PO BOX 9206, MS 81026
FARMINGTON HILLS, MI 48333-9206

PLACER, County Recorder
JIM McCAULEY
DOC- 2004-0002629
Acct 77-SIERRA VALLEY TITLE
Monday, JAN 12, 2004 08:00:00
REC    $3.00 MIC    $3.00 AUT    $1.00
SBS    $0.00

Ttl Pd    $7.00          Nbr-0001008257
                                    slk/SK/1-1

THIS SPACE FOR RECORDER'S USE ONLY:

ESCROW NO. DG-54506527-NM                                    TITLE ORDER NO. 506527

## FULL RECONVEYANCE

SIERRA VALLEY TITLE COMPANY, a Corporation, Trustee under the Deed of Trust executed by

**NATHAN L. TOPOL, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**

Trustor, and recorded **DECEMBER 16, 2002** as Serial No. **2002-0125157** in Book n/a, Page n/a, of Official Records in the Office of the County Recorder of Placer County, California, having been requested in writing by the holder of the obligation secured by said Deed of Trust, to reconvey the estate granted to Trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust in the lands therein described, situated in the County of Placer, State of California reference being hereby specifically made to said Deed of Trust and the record thereof for a particular description of said lands.

IN WITNESS WHEREOF, said SIERRA VALLEY TITLE COMPANY, Trustee, has caused its corporate name and seal to be hereto affixed by its Assistant Secretary, thereunto duly authorized.

DATED January 2, 2004
STATE OF CALIFORNIA
COUNTY OF *Placer*
On *January 6, 2004*
before me, *Cari Lemos*
a Notary Public in and for said State, personally
appeared
*Regina Kay Krahn*

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____

SIERRA VALLEY TITLE COMPANY

BY: _____
REGINA KAY KRAHN, ASSISTANT SECRETARY
BY: _____

CARI LEMOS
COMM. #1266731
Notary Public-California
PLACER COUNTY
My Comm. Exp. June 6, 20__

(This area for official notarial seal)

# EXHIBIT C

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF NEVADA

3

4   IN RE:                              CASE NO.:
                                        BK-12-51014-btb
5   NATHAN L. TOPOL, an individual,     (Chapter 7)

6            Debtor.

7   _____

8

9

10

11

12

13

14

15

16                  DEPOSITION OF

17              REGINA K. GARLAND

18

19             November 25, 2014

20                 1:27 p.m.

21

22       2151 River Plaza Drive, Suite 300

23           Sacramento, California

24

25       Mark S. Patterson, CSR No. 12432



REGINA K. GARLAND                                        November 25, 2014
NATHAN L. TOPOL                                                          2

```
 1                    APPEARANCES OF COUNSEL

 2

 3    For the Trustee for TOPOL ESTATE:

 4         LAW OFFICES OF HARRIS LAW PRACTICE, LLC
           BY: STEPHEN R. HARRIS, ESQ.
 5         6151 Lakeside Drive
           Suite 2100
 6         Reno, Nevada 89511
           775.786.7600
 7         775.786.7764 Fax
           steve@harrislawreno.com
 8

 9    For the Trustee of QPRT TOPOL:

10         DEMETRAS & O'NEILL
           BY: J. CRAIG DEMETRAS, ESQ.
11         230 East Liberty Street
           Reno, Nevada 89501
12         775.348.4600
           775.348.9315 Fax
13         icd@demetras-oneill.com

14

15    For CITIMORTGAGE, INC.:

16         PITE DUNCAN, LLP
           BY: CHRISTOPHER M. McDERMOTT, ESQ.
17         921 11th Street
           Suite 300
18         Sacramento, California 95814
           916.760.3722
19         858.412.2708 Fax
           cmcdermott@piteduncan.com
20

21    ALSO PRESENT:

22         DON GIESEKE

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

REGINA K. GARLAND                              November 25, 2014
NATHAN L. TOPOL                                                3

```
 1                    INDEX OF EXAMINATION

 2    WITNESS:  REGINA K. GARLAND

 3    EXAMINATION                                        PAGE

 4    By Mr. Harris                                    4, 94

 5    By Mr. McDermott                                61, 99

 6    By Mr. Demetras                                 85, 101

 7

 8

 9                   INFORMATION REQUESTED

10                     Page     Line

11                        (NONE)

12             WITNESS INSTRUCTED NOT TO ANSWER

13                     Page     Line

14                        (NONE)

15

16                    INDEX TO EXHIBITS

17    Exhibit              Description              PAGE

18    Exhibit 1     Full Reconveyance                  19

19    Exhibit 2     Deed of Trust                      26

20

21

22

23

24

25
```



REGINA K. GARLAND                                          November 25, 2014
NATHAN L. TOPOL                                                            4

```
 1              DEPOSITION OF REGINA K. GARLAND

 2                 November 25, 2014; 1:27 p.m.

 3

 4                    REGINA K. GARLAND,

 5      having been first duly sworn, testifies as follows:

 6

 7                       EXAMINATION

 8    BY MR. HARRIS:

 9        Q     Do you want to state your name and address,

10    please.

11        A     Sure.  Regina Kay Garland, 5305 Flagstone

12    Street, Carmichael, California 95608.

13        Q     And do you want to give your phone number too,

14    Regina?

15        A     Certainly. (916)961-1347.

16        Q     Okay.  First off, how would you like me to

17    address you?  Ms. Garland?  Or Regina?  Kay?  It's up to

18    you.

19        A     Kay works.

20        Q     Kay works?

21        A     Kay is fine.  Yeah.

22        Q     Okay.  Thank you very much.

23        A     Uh-huh.

24        Q     Kay, my name is Steve Harris.

25        A     Yes.
```



1       Q     I'm an attorney in Reno, Nevada.

2       A     Uh-huh.

3       Q     This is my client, Donald Gieseke.  He's the

4  trustee for the Nathan Topol Estate.

5       A     Uh-huh.

6       Q     Over here is Mr. Demetras, and he represents

7  Virginia Topol, who is not in bankruptcy but her late

8  husband was in bankruptcy or is in bankruptcy.

9       A     Okay.

10      Q     And then over here is Chris --

11      MR. McDERMOTT:  Chris McDermott.

12 BY MR. HARRIS:

13      Q     -- McDermott.

14      MR. McDERMOTT:  And I represent CitiMortgage, Inc.

15 BY MR. HARRIS:

16      Q     And he's also an attorney.  And Mr. Demetras

17 is an attorney, but Mr. Gieseke is not an attorney.

18      A     Okay.

19      Q     So -- and you're here pursuant to a notice of

20 taking deposition.

21      A     Yes.

22      Q     Do you see that document?

23      A     Yes.

24      Q     Okay.  And then I believe my office called you

25 the other day, Norma --



```
1        A      Uh-huh.

2        Q      -- and asked if you were going to be here?

3        A      Uh-huh.  Yes.

4        Q      Okay.  And are you -- are you basically

5   retired and not working, or are you working part time,

6   full time, what?

7        A      I'm retired.

8        Q      Okay.

9        A      Not working.

10        Q      Okay.  What was your last full-time employment

11   position?

12        A      I was the office manager and escrow officer at

13   Stewart Title.

14        Q      Okay.  But let me -- have you ever had your

15   deposition or Rule 2004 Examination taken before?

16        A      I think I've had a deposition taken, but it

17   was years ago.

18        Q      Okay.  Do you understand the process, I ask

19   you questions, and you give me answers under oath and

20   under penalty of perjury?

21        A      Yes.

22        Q      If you don't understand something, I'll be

23   glad to rephrase or repeat the question.

24        A      Okay.

25        Q      I'm here just trying to get the facts with
```

REGINA K. GARLAND                          November 25, 2014
NATHAN L. TOPOL                                            7

1   regard to a certain dispute that I'll explain in a

2   little bit.

3       A    Sure.

4       Q    Is there any reason you cannot give truthful

5   and complete testimony at this time?

6       A    No.

7       Q    You're not under the influence of any drugs or

8   alcohol or anything?

9       A    No.

10      Q    Okay.  Any medications that would prevent you

11  from --

12      A    No.

13      Q    Okay.  Your last full-time employment position

14  before your retirement was at Stewart Title?

15      A    Yes.

16      Q    Okay.  And what branch of Stewart Title did

17  you -- were you the office manager of?

18      A    The Douglas Boulevard in Roseville.

19      Q    In Roseville?

20      A    Uh-huh.

21      Q    And what county was that?

22      A    Placer County.

23      Q    Placer County.

24           How long did you work at that location for

25  Stewart Title?



1          A      I worked for Stewart Title a total -- a total

2     of almost 25 years in the Roseville area, three

3     different offices though.  That one -- the last one was

4     probably a total of ten of those years out of the 25.

5          Q      And the Roseville location?

6          A      It was 3300 Douglas Boulevard, Suite 210.

7          Q      Okay.  By any chance did you know a Bill Hanks

8     in Reno?  He worked at Stewart Title for many, many,

9     many years.

10         A      Sounds familiar.  I think he was in the title

11    department?

12         Q      Yes.

13         A      Yes.  Yes.  I think I talked to him on the

14    phone probably.

15         Q      Okay.  So in your position at the

16    Douglas Boulevard branch for ten years, you were the

17    office manager?

18         A      Actually, for the full 25 years.

19         Q      For the full 25 years?

20         A      Uh-huh.

21         Q      But only ten years were at the

22    Douglas Boulevard branch?

23         A      We were actually at three different

24    Douglas Boulevard addresses over the 25 years.

25         Q      Okay.  So what were the three different



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                      9

1    addresses and the time periods?

2         A    The first one was 3998 Douglas, and that would

3    have been from August of '86 -- and I would only be

4    guessing.

5         Q    That's fine.

6         A    I'm not sure.  Probably six years later.

7         Q    And then after, let's say, about '92 or '93?

8         A    The second address was 2200 Douglas Boulevard.

9    I don't recall the suite number though on that.

10        Q    2200 Douglas Boulevard?

11        A    Uh-huh.

12        Q    And that would be from '92, '93, to when?

13        A    Probably '95.

14        Q    Okay.  And then --

15        A    And that was ten years at the last address,

16   the 3300.

17        Q    '95 to '05?

18        A    Uh-huh.

19        Q    And then what year did you retire?

20        A    '05, 2005 -- I'm sorry.  2010.  I'm off on my

21   dates.

22        Q    Okay.  So you were at the last address,

23   3300 Douglas Boulevard, for about 15 years?

24        A    Probably more like 12.

25        Q    Twelve?

REGINA K. GARLAND
NATHAN L. TOPOL                                    November 25, 2014
                                                              10

```
 1        A    So I messed up a little bit there.

 2        Q    So you think you were at 2200 from '92, '93

 3   to --

 4        A    I'd probably add a few years to that so it

 5   would make sense, and so it would come out to about 25

 6   total.  Yeah.

 7        Q    Okay.  I don't want to put words in your

 8   mouth.

 9             Do you think -- so in '92, '93, commencing and

10   ending --

11        A    Probably '95.

12        Q    Okay.  That's three or four years later.

13             And then '95 to 2010, that's 15 years.

14        A    Okay.  Now I am confused.

15        Q    Okay.

16        A    I don't remember.  I mean I remember when I

17   quit.

18        Q    Okay.  Do you think you were at the 3300

19   location for --

20        A    I know it was at least ten years.

21        Q    Okay.  So would that -- and you retired there

22   in 2010?

23        A    '10.  Yes.

24        Q    Okay.

25        A    I said 2005.  I'm sorry.
```



1        Q     Okay.  So does that mean you probably -- the

2    Stewart Title company moved to 3300, let's say, '99,

3    2000, 2001?

4        A     That makes sense.

5        Q     Somewhere in those three years?

6        A     Yes.

7        Q     Okay.  And you were an office manager from day

8    one at this location?

9        A     I was either branch manager or office manager,

10   right, senior escrow officer.  All that.

11       Q     Okay.  So branch manager?

12       A     Uh-huh.

13       Q     Senior escrow officer?

14       A     Yes.

15       Q     What other --

16       A     And office manager.

17       Q     Office manager.

18       A     And that was from '86 to 2010.

19       Q     Okay.  What is the extent of your education?

20       A     I basically had two years in college with an

21   AS degree.  That was it.

22       Q     Where did you work before Stewart Title?

23       A     I was at First American Title; and prior to

24   that, I was at Sunset Real Estate for seven years.

25       Q     Sunset Real Estate?



REGINA K. GARLAND
NATHAN L. TOPOL

1    A    Yes.

2    Q    Were you a real estate --

3    A    No.

4    Q    -- broker?

5    A    I was assistant to the broker.  Had my real

6  estate license, but I wasn't practicing.

7    Q    And at FATCO, First American -- you call it

8  FATCO, right?

9    A    Right.  Yes.  Yeah.

10    Q    At FATCO, what was your position?

11    A    That was escrow assistant.

12    Q    And then that was --

13    A    And then officer.  That -- I believe I started

14  that in '80, 1980, and was there until I went to Stewart

15  in '86.

16    Q    Okay.  Okay.  What were your -- let's say

17  at -- when you were at the 3300 Douglas Boulevard

18  branch, how many employees did you have at that branch?

19  What was the range?

20    A    At 3300?

21         We, at one point, had upwards of 12 to 13.

22    Q    Okay.  When you retired in 2010, you had 12

23  to 13 --

24    A    No.

25    Q    -- was that --



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

13

1     A    No.  It was lesser then.  It was probably

2  seven to eight.

3     Q    Who took your place when you retired?

4     A    Shelly Kimbrow.

5     Q    Kimbrow?

6     A    K-i-m-b-r-o-w.

7     Q    Is she still there?

8     A    No.

9     Q    Do you know who took her place?

10     A    No.  I -- I really don't think they replaced

11  her in so many words.  Yeah.  No, they didn't replace

12  her.

13     Q    Okay.  What were your -- generally, what were

14  your duties as a branch manager, office manager, and

15  senior escrow manager?

16     A    Makes it sound good, huh?  The function of the

17  branch manager was just to oversee anything going on in

18  the office, to run the day-to-day part of the office,

19  have office meetings, you know, take care of -- oversaw

20  the acquisition of supplies and that sort of thing.

21         And then escrow, obviously, just doing the

22  actual escrows -- I had my own escrow desk and helping

23  with any questions or anything anyone else had.

24     Q    You said escrow desk.

25         On refinancings, purchase sales of properties?

1    A    Yes.  Short sales.  Yes.  Everything.

2    Q    Okay.  So you oversaw the day-to-day

3  operations of the branch?

4    A    Uh-huh.

5    Q    Oversaw any acquisitions that -- by the

6  company to operate that branch?

7    A    Uh-huh.

8    Q    And you had your own escrow desk, as you said,

9  where you had your own files for closings?

10   A    Uh-huh.  For closings.

11   Q    Okay.  Any other duties that you had?

12   A    I was an assistant secretary --

13   Q    Okay.

14   A    -- with the company.

15   Q    For the Stewart --

16   A    For Stewart, slash, Sierra Valley.  Uh-huh.

17  Same company, just different names.

18   Q    Okay.  How long -- when did Sierra Valley

19  become Stewart Title?

20   A    I don't have the exact date.  It was while we

21  were in the 3300 Douglas, so it might have been -- I'd

22  have to guess.

23   Q    That's --

24   A    Maybe nine or ten years while I was there.

25   Q    Okay.  So sometime in the early 2000s?



REGINA K. GARLAND
NATHAN L. TOPOL

```
 1        A     Right.

 2        Q     Okay.  Like 2000 to 2000 and --

 3        A     2002 or '03.

 4        Q     Where it became Stewart Title?

 5        A     Uh-huh.

 6        Q     Okay.

 7        A     We were always owned by Stewart Title.

 8        Q     Oh, you were?

 9        A     We -- right.

10        Q     Okay.  Do you know when you -- well, did you

11   go under the name of Stewart Valley -- or was it

12   Sierra Valley Title?

13        A     When I first started in '86.

14        Q     Okay.  And then do you know when they changed

15   their name of business operations to Stewart Title

16   Company?

17        A     That would have been when we were at

18   3300 Douglas.  But, again, I'm not exactly sure of the

19   year.

20        Q     Okay.  On the escrows -- how many other escrow

21   officers worked with you?

22        A     Majority of the time there were probably two

23   other escrow officers.

24        Q     Okay.  And the three of you handled all the

25   escrow transactions that came into the title company?
```



REGINA K. GARLAND
NATHAN L. TOPOL

1      A      Just to that branch.

2      Q      Okay.  Did you -- did this branch also

3   issue -- or was -- were requests made of preliminary

4   title reports for this branch?

5      A      Yes.

6      Q      Okay.  If you needed a preliminary title

7   report, did the actual branch do it, or did you farm it

8   out to another Stewart Title Company location?

9      A      That's kind of a two-fold answer.  When we

10  first moved into 3300, we also had part of the title

11  department there, so they were issuing the prelims

12  there.  But within a year or two that changed, and

13  everything was run through our Carmichael office, the

14  main office.

15     Q      The title plant?

16     A      Uh-huh.

17     Q      And do you know about when that change took

18  place where everything was run out of the Carmichael

19  branch?

20     A      It was within a year or so of moving in.

21     Q      Moving into the 3300?

22     A      To the 3300.  Uh-huh.

23     Q      And I think you said you moved into 3300

24  sometime in the late '90s early 2000s?

25     A      Yes.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

17

1      Q    Okay. As part of your escrow transactions,

2 what would cause you to open a file, a short sale as you

3 said?

4      A    Uh-huh.

5      Q    Parties wanting to do a buy-sale for a

6 particular property?

7      A    Yes.

8      Q    What else?

9      A    Refinances.

10      Q    Refinances.

11      A    Or loans of any type.

12      Q    Okay. What else?

13      A    That would pretty much be it. Occasionally, I

14 would do a commercial building or construction -- we did

15 construction loans -- I did construction loans too, just

16 the escrow part.

17      Q    Okay. You didn't handle any construction

18 control, disbursement?

19      A    No. Huh-uh.

20      Q    Okay. Was there -- was it primarily

21 residential transactions were handled out of this

22 office?

23      A    Yes.

24      Q    Okay. But there were some commercial

25 transactions?



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

18

1     A     Some.  We actually had two commercial offices

2  at the time in Sacramento County that did the majority

3  of that.  But every once in a while one of our clients

4  would be doing a commercial build or something so we did

5  it.

6     Q     Okay.  In Placer County?

7     A     Yes.

8     Q     Okay.  So were all of your transactions that

9  you handled the escrows for, were they all based out of

10 Placer County?

11    A     The majority of them, but not all of them.

12    Q     Okay.  Some would be in other counties?

13    A     Some would be Sacramento County, and then

14 refinances, especially, seem to be outside counties.

15    Q     Okay.  So did you also handle requests for

16 reconveyances and reconveyances in your role as an

17 escrow officer?

18    A     In my role as assistant secretary.

19    Q     Assistant secretary?

20    A     Uh-huh.

21    Q     Okay.  And how would your role as assistant

22 secretary cause you to be involved in a reconveyance of

23 a deed of trust?

24    A     We would be -- the documents would be either

25 sent to us from another office, mailed to us from



 1   another title company, or in-house from an escrow and so

 2   the documents would have been surrendered to us, the

 3   note, the deed of trust, the request for the

 4   reconveyance fully signed and properly signed before we

 5   would issue a reconveyance.  And then it would go back

 6   out for recording in the appropriate county.

 7        Q     Okay.  And I think you've seen this document

 8   before.  I'll give you what's --

 9        A     No, I haven't.  Not since --

10        Q     Oh.

11        A     -- not since it started.

12        Q     Well, I'll show you what's Exhibit 1.

13        A     Okay.

14             (Exhibit 1 was marked for identification

15                    and attached hereto.)

16   BY MR. HARRIS:

17        Q     First off, let me ask you:  Do you recognize

18   the type of document that is?

19        A     Yes, I do.

20        Q     Okay.  And what is it?

21        A     It's a full reconveyance.

22        Q     Okay.  And, generally, what does a full

23   reconveyance do?

24        A     It states that the loan in this book and

25   pager -- actually, the serial number in this case was



1    paid in full.

2        Q    Okay.  Do you recognize any part of this

3    document?

4        A    Well, that looks like my signature, but I

5    couldn't tell you if I signed it or not.  But that's

6    kind of what it looked like back then.  And I recognize

7    the notary.

8        Q    And who is the notary?

9        A    Cari Lemos.

10       Q    Did she work in your office?

11       A    Yes.  She was an assistant of mine.

12       Q    And I take it she was a notary?

13       A    Yes.  Oh, yeah.  Stamp and all.  Yes.

14       Q    Were you also a notary?

15       A    Yes.

16       Q    Okay.  But, of course, you can't notarize your

17   own signatures?

18       A    No.  No.

19       Q    In an escrow company such as what you worked

20   in, if Cari Lemos notarized your signature would she

21   keep track of that in a notary book, or was there some

22   sort of other rule that you had of keeping track of

23   notaries?

24       A    No.  Normal practice would have been just a

25   line item in her notary book.



1    Q    Okay.  And this line item in her notary book,

2  would you -- what would that line item say?

3    A    It could have the escrow number.

4    Q    Uh-huh.

5    A    It doesn't always.

6    Q    Uh-huh.

7    A    And then I would sign it.

8    Q    Would she describe the document?

9    A    Usually, yes.

10    Q    Okay.  I'm talking just in --

11    A    It was standard practice --

12    Q    -- just in general?

13    A    In general, yes, it would be good, yes, to do

14  that.

15    Q    Okay.  So she would -- would she have the date

16  in her book?

17    A    Uh-huh.

18    Q    Okay.  And she would have --

19    A    The date and the document.

20    Q    The document number?

21    A    Uh-huh.

22    Q    Okay.  The type of document or the document

23  number?

24    A    The type of document.

25    Q    Okay.



```
 1        A    Because when she's notarizing, it's not
 2   recorded yet.
 3        Q    Right.
 4             So she would have the date, the type of
 5   document?
 6        A    Uh-huh.
 7        Q    She would have written your name?
 8        A    Yes.
 9        Q    Okay.  Would you then sign that, her book?
10        A    Yes.
11        Q    Okay.  Would you generally do this for all the
12   transactions that you asked her to notarize your
13   signature for?
14        A    It would be normal practice, yes.
15        Q    To have her sign her notary book --
16        A    Uh-huh.
17        Q    -- for a signature --
18        A    Right.
19        Q    -- that you wanted her to notarize?
20        A    Yes.
21        Q    Do you know if Cari Lemos is still located at
22   the 3300 Boulevard --
23        A    She is not.
24        Q    Okay.  Do you know where she is?
25        A    I believe she's working somewhere in Nevada
```



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
23

```
 1    County.
 2        Q    Okay.  Do you know what title company?
 3        A    Last I knew I think it was Placer Title, but
 4    not sure.
 5        Q    And don't the notaries maintain their own
 6    notary book?
 7        A    As a rule of thumb I -- the ones with
 8    Stewart Title did.  But when you relinquish your notary
 9    or it expires, you're supposed to actually turn those
10    over to the county that you're a notary in.  But Placer
11    County won't take our books, so most of us try to keep
12    them -- or the company keeps them in storage.  It just
13    depends on what the escrow officer or notary did.
14        Q    Okay.  But do they -- as long as they're an
15    active notary, do they normally keep all of their books
16    that they've accumulated or --
17        A    Yes.
18        Q    And you think she's located at the Nevada City
19    office of Placer Title?
20        A    I don't know if it's Nevada City.  I think
21    it's Nevada County, but Placer Title.
22        Q    For Placer Title Company?
23        A    I believe so.
24        Q    Okay.
25        A    Last time I talked to her, that's where she
```



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                      24

```
 1    was.
 2         Q    How long ago did you talk to her about it?
 3         A    Sometime last year.
 4         Q    Okay.  Do you think she still goes under the
 5    name Lemos?
 6         A    No.  She is now -- the last name is Gallino,
 7    G-a-l --
 8         Q    G-a --
 9         A    -- l-l --
10         Q    -- l-l --
11         A    -- i-n-o.
12         Q    G-a-l-l-i-n-o?
13         A    Right.
14         Q    And it's still Cari -- C-a-r-i?
15         A    Yes.
16         Q    All right.  What else -- first off, this
17    document, what's it entitled?
18         A    Full reconveyance.
19         Q    Okay.  And you said you do or do not recognize
20    your signature there?
21         A    It looks like it could be mine, but I don't
22    remember signing.  I mean that was a long time ago.
23         Q    Okay.
24         A    But it's not unusual-looking for how my
25    signature looked then, so --
```



REGINA K. GARLAND
NATHAN L. TOPOL

1      Q    Okay.  What date does this document say that
2  you signed this full reconveyance?
3      A    January 6th, 2004.
4      Q    And it was notarized by?
5      A    Cari Lemos.
6      Q    Okay.  And it appears that she still had an
7  active notary on January 6th, 2004?
8      A    Yes.  Her's was -- the stamp says it was good
9  through June 8th of -- or June -- I can't tell if that's
10 an 8 or a 6, 2004.
11     Q    Okay.  How long have you known Cari Lemos at
12 the time of this notary on January 6th of 2004?
13     A    I'm just guessing maybe five or six years at
14 that time.
15     Q    Okay.  Was it -- was that entire five or six
16 years at the 3300 Douglas office?
17     A    Yes.
18     Q    Who would have -- is this a form, a full
19 reconveyance for Sierra Valley Title Company?
20     A    Is it a form?
21     Yes.  Uh-huh.
22     Q    Okay.  The fact that it says, Sierra Valley
23 Title Company on this full reconveyance, does that mean
24 that Stewart Title Company had not renamed Sierra Valley
25 to Stewart Title Company yet?



1    A    No.  Not necessarily.  That means that because

2  we're listed as the trustee under the deed of trust --

3    Q    Uh-huh.

4    A    -- we use that same name because it's what's

5  on the deed of trust that recorded.

6    Q    Okay.

7    A    And we're still -- we're -- Sierra Valley

8  Title and Stewart Title of Sacramento is one in the same

9  company.

10    Q    All right.  Let's have these deeds of trust

11  marked as the next --

12    A    Can I look at a copy of the deed of trust?

13    Q    Well, let's let him --

14    A    Okay.  Oh, yeah.

15    MR. HARRIS:  Make this 2.

16    THE REPORTER:  Okay.

17        (Exhibit 2 was marked for identification

18              and attached hereto.)

19  BY MR. HARRIS:

20    Q    And then you'll see why we're all here.

21    A    Yeah.  I see.  I think I know.

22        I have a question.

23    Q    Yes.

24    A    What I wanted to see on here was who the

25  trustee is listed as.  And, of course, because it's



1    Citibank, Citibank is the trustee -- or CitiMortgage.

2        Q    Right.  So you're looking at Exhibit 2, the

3    deed of trust.

4        A    Right.  On the first page, Item D, as in

5    David --

6        Q    Right.

7        A    Okay.  So if Citibank was the trustee, there

8    would have been a substitution of trustee also that

9    recorded prior to this, but I haven't seen that.

10       Q    We haven't either.

11       A    Is that the question?  Oh, that's the

12   question.  Okay.

13       Q    Well, let me ask you this --

14       A    Uh-huh.

15       Q    What was the process, in general, for -- let

16   me ask -- you were in charge of executing full

17   reconveyances for this office?

18       A    Uh-huh.

19       Q    Okay.  Was there anybody else during, let's

20   say, the middle 2000s, like '03, '04, '05 that would

21   also execute full reconveyances at your office?

22       A    Our county manager could have.  I don't know

23   if he did or not.

24       Q    But he was outside your office, the county

25   manager?



1     A     No.  He was in our office.

2     Q     He was?

3     A     Uh-huh.

4     Q     Okay.  Who was the county manager?

5     A     Clark Davenport.

6     Q     Okay.  And Clark Davenport was -- what do you

7  mean a county manager?

8     A     He oversees all the offices in the

9  county for --

10    Q     For Sierra Valley, slash --

11    A     -- for Placer County.

12    Q     For Sierra Valley Title, slash, Stewart Title?

13    A     Yes.

14    Q     Okay.  And you said there were two other

15  Placer County offices in addition to yours?

16    A     There was -- at the time I left there were two

17  other Roseville offices and one Auburn office in Placer

18  County.

19    Q     Okay.  Doesn't Placer County go up to

20  Lake Tahoe?

21    A     It does.

22    Q     Okay.  Were there any offices up there?

23    A     No.  Auburn was the highest one.

24    Q     Okay.  So you see a full reconveyance in front

25  of you which is Exhibit 1.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

29

```
 1        A     Uh-huh.

 2        Q     And who -- you're -- normally, the full

 3   reconveyances start out as a form without some of the

 4   spaces filled in?

 5        A     Absolutely.

 6        Q     Okay.  For instance, I assume in the form -- I

 7   assume in the upper left-hand corner when it says, When

 8   recorded mail to, that would be blank?

 9        A     Yes.

10        Q     Okay.  And I assume there wouldn't be any

11   recording information in the upper right-hand corner?

12        A     Correct.

13        Q     Because it's not recorded yet.  We're just

14   talking about a blank form.

15        A     Uh-huh.

16        Q     What else would be blank on this form?

17        A     There would be no escrow number nor title

18   number filled in alongside of the words full

19   reconveyance --

20        Q     Right.

21        A     -- or return address for mailing.  And there

22   would not be the borrower's name nor --

23        Q     Okay.  And then the trustor --

24        A     -- nor the recorded date, as in the body, nor

25   the serial number.
```



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
30

```
 1        Q    All right.  Anything else?
 2        A    And then the signature line and notary
 3    information.
 4        Q    Okay.  So if you received a full reconveyance
 5    blank form and you were going to cause a full
 6    reconveyance to be signed and recorded --
 7        A    Uh-huh.
 8        Q    -- who would fill in these blanks?
 9        A    It could vary.  In this case the escrow number
10    was also one in my office.  So what would normally
11    happen is that escrow officer handling that escrow would
12    gather the documents that say the loan has been paid in
13    full and give those to myself or my assistant.
14        Q    Okay.
15        A    And I usually got things in stacks, so there's
16    more than one.
17        Q    From this escrow number, and it's escrow
18    No. DG-54506527-NM.
19             Do you know which escrow officer that is?
20        A    Nicole Miller.
21        Q    Okay.  And Nicole Miller.
22             Do you know where she is now?
23        A    Douglas branch.  I think Norma's talked to
24    her.
25        Q    Nicole Miller?
```



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                      31

1       A    Uh-huh.   Either she talked to Nicole Miller or

2  Debbie Shefke.

3       Q    Debbie Shefke?

4       A    Uh-huh.   They're on the same desk.   They're

5  both escrow officers.

6       Q    And by Norma, you mean Norma from -- my

7  paralegal from my office?

8       A    Yes.

9       Q    Okay.   I just wanted Chris to know that.

10      A    I'm sorry.

11      MR. McDERMOTT:  Oh, no.   Thank you.   I appreciate

12  that.

13      THE WITNESS:  If I need keep my answers shorter,

14  tell me.   I'm sorry.

15  BY MR. HARRIS:

16      Q    You're doing fine.

17      A    Okay.

18      Q    Nicole Miller.

19           This was -- you say was her escrow?

20      A    Yes.

21      Q    Okay.   Do you have any way of telling what

22  kind of escrow it was from the escrow number?

23      A    No.

24      Q    Okay.   Do you have any other clues in looking

25  at this full reconveyance as to what kind of escrow it



REGINA K. GARLAND
NATHAN L. TOPOL

1   would be, looking at the full reconveyance for the deed

2   of trust?

3        A    No.  No, I don't.

4        Q    So by this being Nicole Miller's escrow as

5   indicated by the escrow number --

6        A    Uh-huh.

7        Q    -- and we have nothing else to go on except

8   this number on the escrow and her initials that it was

9   her escrow?

10       A    Yes.

11       Q    Okay.  We can't tell what kind of escrow it

12  was?

13       A    No.

14       Q    So would you have any other involvement with

15  this full reconveyance or this escrow other than signing

16  the full reconveyance and causing it to be recorded?

17       A    Once I had the proper documents that says it's

18  been paid off and can be reconveyed, no, that would be

19  it.

20       Q    Okay.  What would you normally require as an

21  assistant secretary signing off on a full

22  reconveyance -- would you normally require to look at

23  and review before you signed off?

24       A    The original note, either the original deed of

25  trust of -- which we're not going to have.  I'm sorry.



REGINA K. GARLAND                                November 25, 2014
NATHAN L. TOPOL                                              33

1   We get a certified copy of that from the county, the

2   deed of trust, the original note, and a request for

3   reconveyance signed by the beneficiary.

4          And in this case, there would have been a

5   substitution of trustee if we were the ones issuing the

6   reconveyance.

7   Q    So you would ask for a certified copy of the

8   deed of trust from the recorder's office?

9   A    Right.

10  Q    Who would ask for that?

11  A    Actually, we -- I'm sorry.  Let me back up.

12  We'd probably have that in their file.

13  Q    A certified --

14  A    Because when the title search does the search

15  of the property, they're going to pull up a copy of

16  that, so we usually request a copy at that time.

17  Q    So would there be a prelim that would --

18  A    Yes.

19  Q    -- be part of this?

20  A    Uh-huh.  On the property that's -- that the

21  loan is on.  Yes.

22  Q    So normally when you're asked to sign a

23  reconveyance as an assistant secretary, you would have a

24  certified copy of the deed of trust or a prelim from

25  your title plant?



1    A    I wouldn't necessarily have a copy of the

2   prelim.  It would depend on if I had any questions on

3   anything -- if something looked out of place to me.

4    Q    Would you have a copy of the deed of trust?

5    A    Yes.

6    Q    Okay.  But you wouldn't have the original?

7    A    No.  Because the original would have gone back

8   to the lender and that would have been in their hands,

9   unless they were the ones who sent it to us for

10  reconveyance.

11   Q    Okay.  And you would have the original note?

12   A    Yes.

13   Q    Would you -- what if you didn't have the

14  original note?  Would you still under some circumstances

15  execute a full reconveyance as an assistant --

16   A    I wouldn't.  No.

17   Q    -- secretary?

18   A    I would not.  Huh-uh.

19   Q    Okay.  So you had the original note?

20   A    I can only assume that we had it.  That would

21  be normal.

22   Q    So, well, we're just assuming that you had

23  certain things.

24   A    Uh-huh.

25   Q    And that would be some sort of evidence of the



1    deed of trust that was recorded?

2        A    Yes.

3        Q    We're going to assume that you had the

4    original note.  We're assuming that you had -- and I'm

5    not trying to put words in your mouth --

6        A    No.  I know.

7        Q    -- a substitution of trustee.  Okay.

8        A    That would have been needed, the substitution

9    of trustee.

10       Q    Okay.  And then the substitution would have

11   substituted the original trustee, which is who?

12       A    Citibank.

13       Q    Okay.  And how do you know the original

14   trustee was Citibank?

15       A    Item D on the first page of the deed of trust.

16       Q    And it says -- what's the name of the trustee?

17       A    The trustee is Citibank Service Corp., a

18   California corporation.

19       Q    Okay.  And then also on this deed of trust,

20   Exhibit 2, it says, Recordation requested by, and do you

21   see who's requesting that?

22       A    Sierra Valley.  Uh-huh.

23       Q    Oh.  That's above --

24       A    At the top.

25       Q    Below it also --



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    36

```
 1        A    Yes.  Uh-huh.

 2        Q    On this deed of trust, the one that's

 3   Exhibit 2 --

 4        A    Yes.

 5        Q    -- it says, Above recordation requested by

 6   Sierra Valley, and there's an escrow number there?

 7        A    Yes.

 8        Q    And is that the same escrow number as

 9   appearing on the full reconveyance?

10        A    Yes.

11        Q    Why are they the same?

12        A    You use the -- the -- you start kind of

13   backwards with the NM, the initials, and then the six

14   digit number --

15        Q    Uh-huh.

16        A    -- and then the escrow numbers.  The other

17   digits just identify which branch it is is all.

18        Q    Okay.  So what is the date of the deed of

19   trust that -- when it was recorded?

20        A    It recorded in 2002, October 16th, 2002.

21        Q    Okay.  So at the time of this recordation of

22   the deed of trust, October 16th of 2002, this

23   Sierra Valley No. 32-506527-NM had been written on it?

24        A    Yes.

25        Q    Okay.  And then when the full reconveyance was
```

1    filled out -- and you said one of the escrow numbers is

2    normally typed in the form?

3        A    Yes.

4        Q    Okay.  Why would they type in the same number?

5        A    The 506 -- because when we received

6    documentation for the full reconveyance, in order to do

7    the full reconveyance, it would go back through the

8    original escrow that the loan was put on -- in.

9             Does that make sense?

10       Q    You would -- you would use the original escrow

11   on the deed of trust?

12       A    Right.  Right.

13       Q    For the full reconveyance escrow number?

14       A    For the reconveyance, yes.

15       Q    Okay.

16       A    Because all of those documents would then go

17   together into the file.

18       Q    Okay.  On the deed of trust in the upper

19   left-hand -- you want to -- it says, When recorded mail

20   to?

21       A    Yes.

22       Q    Do you want to just read out loud the name of

23   where it was mailed to and the address?

24       A    Certainly.  Citibank FSB, in care of

25   CitiMortgage, Inc., Post Office Box 9206, MS 81026,



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

38

```
 1    Farmington Hills, MI 48333-9206.
 2         Q     Great.  That's all I need.
 3               And then below that it says, Send tax notices
 4    to, and I think it's a different address?
 5         A     Citibank in Saint Louis.  Yes.
 6         Q     Okay.  When this deed of trust was recorded on
 7    October 16th, 2002, in Placer County Recorder's Office,
 8    who would mail -- I take it the original is recorded?
 9         A     The original is recorded and mailed directly
10    to Citibank.
11         Q     Who mails the original to Citibank?
12         A     The county.
13         Q     Okay.  Do you know if the county keeps any
14    records of sending out these original documents?
15         A     I don't believe they do, but I'm not sure.
16         Q     Okay.  You don't know if they have a tracking
17    system or a little book like a notary?
18         A     I doubt it.  I doubt it.
19         Q     Okay.  But you know for a fact that it's the
20    county's obligation to send out the original documents
21    as requested on the recorded document?
22         A     Yes.  Yes.
23         Q     Okay.  And, again, you said Nicole Miller more
24    than likely filled in these blanks in the full
25    reconveyance because it was -- she was -- it was her
```



REGINA K. GARLAND                          November 25, 2014
NATHAN L. TOPOL                                          39

1    escrow?

2         A    It -- not necessarily though.  She may have

3    given us the documents to substantiate doing the full

4    reconveyance, and then we filled it in, my assistant or

5    I.  It just depends.

6         Q    Okay.  It could have been you, it could have

7    been your assistant?

8         A    It could have been.  Or it could have been in

9    her file, which that was not uncommon for them to do.

10        Q    Okay.  And then the trustor.

11             Do you want to read who the trustor is on the

12   full reconveyance?

13        A    Nathan L. Topol, a married man as his sole and

14   separate property.

15        Q    Okay.  And then do you want to read who the

16   trustor is on the deed of trust?

17        A    Nathan L. Topol, a married man as his sole and

18   separate property.

19        Q    And that's under Subparagraph B --

20        A    B, as in boy, yes.

21        Q    -- the first page?

22             Okay.  And then it says, Trustor and

23   recorded -- it's now mentioning the original deed of

24   trust, which is Exhibit 2?

25        A    Yes.



1    Q    Okay.  And it says, And recorded -- what date

2  does it say the -- in the full reconveyance that the

3  deed of trust was recorded on?

4    A    It says December 16th, when, in fact, it's

5  October 16th.  That's a typo.

6    Q    Okay.

7    A    2002.  It does reference the correct serial

8  number, so that would supersede the wrong month -- the

9  incorrect month that's on there.

10   Q    Okay.  Why do you say it would supersede the

11 incorrect --

12   A    That's just normally how the county would

13 handle it.

14   Q    The county or the recorder's office?

15   A    The recorder's office.

16   Q    So when you say the county, you mean the

17 recorder's office?

18   A    Yes.

19   Q    And do the serial numbers on the full

20 reconveyance match up with the serial numbers on the

21 recorded deed of trust?

22   A    Yes.

23   Q    And do you want to recite those real --

24   A    Certainly.  0125157.

25   Q    Okay.  And then what other information was



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    41

1    filled in on the form, full reconveyance?

2         A    The borrow's name, but we talked about that.

3    Other than that it would have -- the rest of it would

4    have been under the serial number, and the recording

5    date would have been preprinted information.  I'm sorry.

6    Let me back up on that.  Placer, the word "Placer," for

7    Placer County.

8         Q    That would have been typed in?

9         A    It could have been.  It looks like it's not

10   here though.  It looks like it's part of the original

11   printing.

12        Q    Okay.

13        A    I know at one time we were typing in the

14   county, but . . .

15        Q    How about in the last paragraph, the two

16   lines, it says, Assistant secretary.

17             Was that part of the form, assistant

18   secretary?

19        A    Yes, it is.

20        Q    Okay.  And on the notary, I think they call it

21   a jurat --

22        A    Yes.

23        Q    -- in the lower left-hand corner?

24        A    Uh-huh.

25        Q    Who would have filled out the information

1    there, such as Placer, the date, the notary name?

2        A    The notary.

3        Q    And that would be Cari Lemos --

4        A    Yes.

5        Q    -- at that time?

6        A    Uh-huh.

7        Q    Okay.  And so she's -- has Cari written in

8    Placer?

9        A    I'm sorry?

10       Q    Is that -- do you think -- do you believe that

11   Cari Lemos has written in all of the handwritten

12   information that's in the lower left-hand corner of this

13   full reconveyance?

14       A    In the notary jurat, yes.

15       Q    Okay.  Okay.  On your signature, Kay, do

16   you -- did you normally sign your full first name, your

17   middle name, and your last name?

18       A    Yes.

19       Q    Did you sign it in any other manner when you

20   signed title company documents that you recall?

21       A    Under the title of assistant secretary?

22       Q    Right.

23       A    I don't -- I wouldn't sign any other

24   documents.  But, no, it should be that way.

25       Q    Was a full reconveyance the only document that



```
 1   you would sign as an assistant secretary?
 2        A    Yes.
 3        Q    You don't recall any other types of documents?
 4        A    No.  No.
 5        Q    Generally, is -- how many full reconveyances
 6   would you sign as an assistant secretary, let's say, per
 7   month?
 8        A    That's hard to say.  I mean it could be none,
 9   or it could be 20.  It just depends.
10        Q    Did you have any kind of book that you would
11   keep track of the full reconveyances that you executed
12   as an assistant secretary?
13        A    No.
14        Q    Would the only -- would there have been a file
15   more than likely given to you for this transaction that
16   you would review for its contents before signing this
17   full reconveyance?
18        A    No, just the documents needed for the
19   reconveyance.
20        Q    Would they be in some kind of file folder?
21        A    Not always.
22        Q    What would you do with the documents, in
23   general, after you signed a full -- after you reviewed
24   all the documents and signed as an assistant secretary
25   in a full reconveyance, what would you normally then do
```



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    44

1    with the documents?

2         A    If they were documents in-house, they would go

3    either to the file that was filed with us, or the file

4    would have been pulled from our storage and put into the

5    original file.

6              If they were documents that came in from

7    another title company that actually did the escrow that

8    paid off the loans or the deeds of trust, then those

9    would go out by certified mail to that title company.

10        Q    Okay.  Is there any way of finding out,

11   ascertaining from this full reconveyance, if this was

12   from a another title couple or from your --

13        A    No.  It was an in-house and in Placer County

14   because it was -- Nicole Miller was an escrow officer in

15   my office.

16        Q    Okay.  So if there were documents that had to

17   be sort of refiled after your review --

18        A    Uh-huh.

19        Q    -- they would not have gone outside of

20   Sierra Valley, slash, Stewart Title Company?

21        A    No.

22        Q    They would have stayed in-house somewhere?

23        A    In-house, exactly.  Either our branch there or

24   storage, which would go through the main office.

25        Q    Okay.  So if they were kept at the branch, do



1   you know how long the documents would be kept at the
2   branch, the 3300 Douglas?
3       A    It was just a matter of how many files we had
4   and how many -- at any given time, so it -- we had a
5   very small storage area.  There was no way to really
6   tell.
7       Q    Okay.  What would the process be for taking it
8   out of storage at the branch and storing it -- well,
9   where else would it be stored?
10      A    Our company had, I think -- I believe it was
11  Iron Mountain at that time that they were using for
12  storage.  And it would go through our courier system,
13  which was a person, would take the document -- or the --
14  I'm sorry -- would take the file, our files, to our main
15  office in Carmichael to the title department.  And then
16  they would -- they monitored the actual Iron Mountain
17  transactions.
18      Q    Would it be stored in Carmichael, or would it
19  then be dispatched to Iron Mountain?
20      A    It would then be sent to Iron Mountain.
21      Q    Okay.  And then do you know what the policy
22  was for how long these records would be maintained at
23  Iron Mountain?
24      A    I believe the legal answer to that is seven
25  years, and I know that we probably kept them longer than



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                   46

1    that.  I'm not -- because I know I was able to get, you

2    know, get files back from Iron Mountain that were older

3    than that for a while.  But right before I left, they

4    were shredding documents that were really old.

5         Q    How do you know that?

6         A    We were all given shred bins.  And then in a

7    conversation I had with one of the gentlemen that -- at

8    the title department that were in charge -- that was in

9    charge of the files going to Iron Mountain and keeping

10   track of those and that sort of thing, he was telling me

11   about them -- they were shredding already.

12        Q    Would they ask your permission to shred

13   anything?

14        A    No.  Huh-uh.  No.

15        Q    Okay.  What are shred bins?

16        A    Oh.  It was like a big garbage can with a

17   locked lid on it with just a little slit in it where you

18   can put documents in, file folders and that sort of

19   thing.

20        Q    But wouldn't those just be at the various

21   branch offices?

22        A    Right.  But then they're picked up by a

23   shredding company.

24        Q    Right.

25        A    That shreds them for us.  But, yes.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
47

1      Q    Would you have placed these CitiMortgage Topol
2  documents into a shred bin after you were through with
3  them?
4      A    No.  Well, not from when I was there because
5  that was still within the seven-year time frame.
6      Q    Okay.
7      A    And what we would normally do is our files
8  would go, we would box them up, write down a record of
9  them.  They would go to the main office in Carmichael.
10 And they would then put them, because I think they
11 actually had a different -- another place besides Iron
12 Mountain because we had so many files there.
13     Q    So you think they had another facility besides
14 Iron Mountain?
15     A    They did as far as I know, but I don't know --
16 I don't remember what that was.
17     Q    Okay.  But you have no reason to believe --
18 but your normal course -- excuse me -- your normal
19 procedure after reviewing documents instant to you
20 executing a full reconveyance as an assistant secretary
21 was, if they were in-house, is to return them to the
22 file?
23     A    Yes.
24     Q    Okay.  Would you do that, or your assistant
25 would do that, or you would -- how did you do it?



REGINA K. GARLAND
NATHAN L. TOPOL

```
 1          A     Either we did that, my assistant or myself, or
 2   the escrow officer whose file it was would do that.
 3          Q     Okay.  That had the file?
 4          A     Right.
 5          Q     Okay.  And then would the escrow officer then
 6   dispatch that file to Carmichael and they would then put
 7   it with Iron Mountain or some other storage facility?
 8          A     If it was old enough -- if was there was no
 9   room in the backroom.  Let's put it that way.  Because
10   our storage in the back in that particular office was
11   limited.
12          Q     Okay.  And, again, your normal procedure for
13   executing a full reconveyance was to have some evidence
14   of a recorded deed of trust?
15          A     Yes.
16          Q     The original note?
17          A     Yes.
18          Q     A substitution of trustee?
19          A     When it applies, right.
20          Q     When it applies?
21          A     Yes.
22          Q     I assume that if --
23          A     In this case, it should have applied, yes.
24          Q     Right.  But if Sierra Valley had been on a
25   deed of trust, then you wouldn't have worried about
```



1    that --

2        A    Right.

3        Q    And then a request for reconveyance?

4        A    Yes.  Signed by the beneficiary.

5        Q    In this case it would have been --

6        A    CitiMortgage.

7        Q    -- CitiMortgage?

8        A    Yes.

9        Q    Okay.  On the full reconveyance document on

10   Exhibit No. 1 --

11       A    Yes.

12       Q    -- on the upper left-hand corner it says,

13   Recording requested by Sierra Valley Title Company and

14   when recorded mail to -- now, who is -- who would have

15   filled in that information in the upper left-hand

16   corner?

17       A    The recording requested by Sierra Valley

18   Title, that's just a stamp that the county has.

19       Q    Right.

20            But below that?

21       A    Oh, below that?

22            It would have been typed in by whoever

23   prepared the full reconveyance.

24       Q    Someone in your office?

25       A    Uh-huh.



1    Q    Okay.

2    A    At that point, yes.

3    Q    Okay.  And do you want to read that name and

4  address as to where it's mailed to after being recorded?

5    A    Certainly.  Citibank FSB, in care of

6  CitiMortgage, Inc., Post Office Box 9206, MS 81026,

7  Farmington Hills, MI 48333-9206.

8    Q    And is that the same name and address on the

9  full reconveyance that appears on the deed of trust in

10  the upper left-hand corner for, When recorded mail to?

11    A    Yes.

12    Q    Okay.  On the full reconveyance upper -- sort

13  of upper right, it says, Title order No. 506527?

14    A    Yes.

15    Q    That seems to have six -- the same numbers in

16  the escrow number?

17    A    If the property is in Placer County, it would

18  have the same number as our escrow number, which are

19  the -- just the five -- the six digits before the

20  initials.

21    Q    The 506527?

22    A    Uh-huh.

23    Q    Okay.  And the -- on the escrow number, what's

24  the DG stand for?

25    A    Douglas, because it was Douglas Boulevard.

REGINA K. GARLAND
NATHAN L. TOPOL

1    Q    Okay.  And the 54 stands for?

2    A    Our actual office address, 3300 Douglas.

3    Q    And you give that a designation of 54?

4    A    Yes.  The company did.

5    Q    Okay.  And then the escrow number would be

6    the 506527?

7    A    Yes.

8    Q    And then the NM, of course, is Nicole Miller

9    in this case?

10   A    Yes.

11   Q    Anything else in this document -- except for

12   the top up here, this top case number, that's bankruptcy

13   related.  I'll tell you that now.

14   A    Yes.  Okay.

15   Q    Is there anything else in this document that

16   is -- that you want to remark about or is -- causes you

17   to recollect anything at the time you --

18   A    No.

19   Q    -- supposedly signed this?

20   A    No.

21   Q    Do you know who Nathan Topol is,

22   Nathan L. Topol?

23   A    No.

24   Q    Have you ever heard this name before today?

25   A    Norma.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

52

```
 1    Q    Oh, Norma.

 2         Again, my paralegal?

 3    A    That was the first time.

 4    Q    I assume you have never met Nathan Topol?

 5    A    No.

 6    Q    Have you ever met a Topol family member?

 7    A    Not that I'm aware of, no.

 8    Q    Ever met a Steve Topol?

 9    A    No.

10    Q    Peter Topol?

11    A    No.

12    Q    Judy Topol?

13    A    No.

14    Q    How about Byron Topol?

15    A    No.

16    Q    Samantha Topol?

17    A    No.

18    Q    B.J. Topol?

19    A    No.

20    Q    David Topol?

21    A    Big family.

22         No.

23    Q    Tamara Topol, or Tammy Topol?

24    A    No.

25    Q    Virginia Topol?
```



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                      53

```
 1        A    No.
 2        MR. HARRIS:  Let's take a couple-minute break.  I
 3   just want to talk to the trustee.
 4                    (Brief recess taken.)
 5   BY MR. HARRIS:
 6        Q    Kay?
 7        A    Yes.
 8        Q    You -- in your procedures you have a fully
 9   filled out full reconveyance awaiting your signature in
10   general, and you've said that some of the things, some
11   of the documents -- the documents that you required
12   before you sign in front of a notary as assistant
13   secretary of the title company is you stated that one of
14   the things you would check is a request for
15   reconveyance?
16        A    Yes.
17        Q    Okay.  And who -- would this be an executed
18   request for reconveyance?
19        A    Yes, by the beneficiary.
20        Q    And that would be, in this case, by
21   CitiMortgage?
22        A    Yes.
23        Q    Citibank?
24        A    Citibank.  Yes.
25        Q    Would there be any circumstance -- let's say
```



REGINA K. GARLAND
NATHAN L. TOPOL

1   you had everything else but you didn't have a request

2   for reconveyance duly -- would it be signed by a notary

3   or not by a notary?

4        A    Not by a notary.

5        Q    Okay.  So let's say would there be any

6   circumstance that you would execute a full reconveyance,

7   in general, in general, without an executed request for

8   reconveyance in front of you?

9        A    No.

10       Q    And then another thing you said you needed to

11  have in front of you before you signed as an assistant

12  secretary of the title company on a full reconveyance is

13  that you would require, if applicable, a substitution of

14  trustee duly executed?

15       A    Yes.

16       Q    Okay.  And this would be in the event that the

17  deed of trust did not -- the trustee on the deed of

18  trust did not match the request for reconveyance --

19       A    No.

20       Q    -- beneficiary?

21       A    No.  If it was being sent to us for -- to

22  reconvey, we're not able to reconvey unless we're

23  substituted in --

24       Q    Okay.

25       A    -- because Citibank is the trustee.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

55

1        Q     Okay.  So in the request for reconveyance,
2   would the beneficiary be signing that?
3        A     Yes.
4        Q     Okay.  And if the beneficiary was also the
5   trustee, what -- they would -- and they wanted the title
6   company to sign the reconveyance, full reconveyance,
7   they would do a substitution of trustee?
8        A     Yes.
9        Q     Okay.  On a substitution of trustee, would
10  that be notarized?
11       A     Yes.
12       Q     Okay.  So in an instance where you received a
13  request to sign a full reconveyance by the title company
14  and it did not match the deed of trust, if you didn't
15  get a substitution of trustee your normal procedure
16  would -- not to sign a full reconveyance --
17       A     Exactly.
18       Q     -- and ask more questions?
19       A     Yes.
20       Q     Okay.  And then what if you didn't have --
21  what if you had everything else -- what if you have
22  everything but the original note, let's say you had a
23  duly signed request for reconveyance, a duly signed
24  substitution of trustee, hypothetically?
25       A     Uh-huh.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

56

1      Q      And evidence of the deed of trust but you

2   didn't have the original note, would you, in general,

3   sign a full reconveyance?

4      A      No.

5      Q      Would there be instances that you would be

6   provided the original note at a later point in time

7   after recordation?

8      A      We wouldn't accept it.  We wouldn't record it

9   without that.

10     Q      Without the original note in your possession?

11     A      Absolutely.  Uh-huh.

12     Q      Would there be any instances that you would

13  record a full reconveyance without the presence of an

14  original note?

15     A      No.

16     Q      What -- has there ever been an instance where

17  the beneficiary in your experience -- in general, was

18  there ever an instance where the beneficiary wanted to

19  take the deed of trust off, at least the deed of trust

20  in the record, but still have the note in effect?

21     A      Not that I'm -- not that I remember or am

22  aware of.

23     Q      Okay.  Are there any other documents that you

24  would want from a beneficiary or a lender before you

25  executed a full reconveyance other than the original

REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    57

1    note, executed substitution of trustee, if applicable,

2    executed request for reconveyance, and some evidence of

3    a deed of trust?

4         A    No.  Huh-uh.

5         Q    You wouldn't necessarily require the original

6    deed of trust?

7         A    No.  Because that would be of record.  We

8    could get a recorded copy --

9         Q    Okay.

10        A    -- if we didn't have one in our file.  And if

11   we have a base file, there would have been a copy of it

12   in there that we could affix the recording information

13   on.

14        Q    Would there be any -- and, again, in your

15   review of the file records before signing the full

16   reconveyances as an assistant secretary, would you ever

17   receive a letter of instructions from the beneficiary or

18   a lender?

19        A    We might have received a letter from a lender,

20   but it would have been kind of a rare occurrence.  I --

21   I rarely, if ever, sign reconveyances for full

22   beneficiaries, lenders.

23            Usually we would get their full -- normally,

24   on a lender like Citibank, or, say, Chase Mortgage or

25   whatever, once that loan is paid in full, they would



1    send us the document, full reconveyance, to record as

2    opposed to having us prepare one.

3         Q    Okay.  Would they also send you the original

4    note?

5         A    No.  Not in that case.  They don't have to at

6    that point.

7         Q    What do you mean?

8         A    Well, if they're sending us this, we're just

9    recording this for them.

10        Q    This, being the full reconveyance?

11        A    The full reconveyance.  I'm sorry.  Yes.

12        Q    Okay.

13        A    Yeah.

14        Q    So if they had signed the full reconveyance

15   and just asked you to record it, you wouldn't go through

16   any real examination?

17        A    No.  Because they're the trustee stating that

18   it's been paid on this document so we wouldn't need --

19   in the full reconveyance document we wouldn't need

20   anything other than the letter of instruction.

21        Q    Okay.  So assuming -- back to the instance

22   where there was a substitution of trustee, you would

23   require the original note?

24        A    Yes.

25        Q    Okay.  Would there -- when you have the



1   original note in front of you, would you require any

2   kind of notations on the note by the lender?

3        A    No.   The full reconveyance -- the lender

4   would -- on the deed of trust there is -- I'm sorry.

5   I'm bouncing around.   There is normally a place on the

6   deed of trust that has a page that says, Request for

7   full reconveyance.   And I don't see it here.   So that

8   could be something that I remembered.

9             If not, there's a form that we provide to them

10  for them to sign requesting the full reconveyance for

11  us.   That would be the only notation we would need along

12  with the original note.

13       Q    And, again, it's the request for full

14  reconveyance, right?

15       A    Would be signed by the existing beneficiary --

16       Q    Right.

17       A    -- whether it be an individual or

18  institutional.

19       Q    Okay.   Just one second.

20       A    Uh-huh.

21       Q    On a substitution of trustee document, which

22  in the instance of Exhibit 1 you would -- you just

23  stated you would need because you weren't the trustee

24  under the original deed of trust?

25       A    Right.



1    Q    Okay.  Would you -- would you -- would the

2    title company, your office, normally have recorded the

3    substitution of trustee, or would it have been

4    previously recorded?

5    A    It could have been either way.

6    Q    Have you ever heard of instances in your

7    tenure at the title company where other recorder's

8    offices misrecorded something?

9    A    Certainly.

10    Q    How do they go about locating a misrecorded

11    document?

12    A    They usually don't.

13    Q    It's lost?

14    A    Uh-huh.  Yes.

15    Q    Do you know if there's any way that the

16    recorder's office can go through, like, let's say, a

17    particular date, time span, let's say, a December '03

18    through January of '04 and search all the documents that

19    were recorded just in that time frame?

20    A    Certainly.  I think -- I believe they do.  I

21    haven't seen it.  But I'm sure they have some system for

22    that.

23    MR. HARRIS:  I don't have any other questions at

24    this time.

25         But do you have some, Chris?



1        MR. McDERMOTT:  I do.

2        MR. HARRIS:  Okay.  Do you mind if I maybe reserve

3    the right to ask questions after you're through, and if

4    you want to ask more after I'm through, you can?

5        MR. McDERMOTT:  Sure.  Yeah.  No problem.

6        MR. HARRIS:  Is that okay?

7        MR. DEMETRAS:  Yeah.  That's fine.

8        MR. HARRIS:  I'm fine for now.

9            Do you want to go -- who wants to go next?

10       MR. McDERMOTT:  I can go.

11

12                        EXAMINATION

13   BY MR. McDERMOTT:

14       Q    As Mr. Harris said earlier, I'm

15   Chris McDermott.  We represent -- I represent

16   CitiMortgage.  I'll do my best not to be too duplicative

17   of a lot of Mr. Harris' questions.  Mine might be

18   slightly different, but I'm just -- so if I ask

19   something that it sounds like you've already answered

20   it's just because I'm trying to get really clear what

21   the situation is.

22       A    Okay.

23       Q    So you indicated that Stewart Title -- Stewart

24   Title owned Sierra Valley, and at one point

25   Sierra Valley started -- the name -- there was no longer



1    documents in the name of Sierra Valley after -- at some

2    point in 2002 or 2003, they were all in the name of

3    Stewart Title?

4        A    Yes.

5        Q    So Stewart Title would be like the parent

6    company of Sierra Valley?

7        A    Exactly.

8        Q    Okay.  How, generally, would -- so if I refer

9    to -- going forward I'll just refer to it as Stewart

10   Title, but I might -- I'll use them kind of

11   synonymously.

12           How, generally, would Stewart Title receive a

13   request for reconveyance?  Would it usually be through

14   the escrow process?

15       A    Yes.

16       Q    Would Stewart Title receive a request for a

17   reconveyance if it didn't handle the escrow for the loan

18   transaction?

19       A    Not if we weren't the trustee on the deed of

20   trust.

21       Q    Okay.

22       A    Usually if their first transaction was handled

23   by Stewart --

24       Q    So if Stewart Title didn't handle the escrow,

25   would it receive a request -- were there cases where it



would receive a request to process a reconveyance?
A We'd only receive a request if Stewart or Sierra Valley were the trustees.
Q Okay.
A So normally we would have had to have handled an escrow, prepared the actual document, note and deed of trust and that sort of thing.
Q So --
A It's unusual for an institutional lender.
Q Okay. And I know you've commented earlier maybe on how often you would do this.
But how often would Stewart Title receive requests for lien reconveyances?
A It's really hard to say because I don't -- we had 14 offices. I don't know how many they would get. There's no exact, you know, we get two on Tuesdays or that sort of thing. I mean it could be we could get some in the mail, it could come from other offices.
Q Okay.
A There's all kinds of avenues of receiving it, so there's no way for me to even say how many we get.
Q Okay. How common was it for Stewart Title to be either an originating trustee on a deed of trust or a substitute of trustee on a deed of trust?
A That's another one of those questions that --

REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    64

```
 1        Q     Would you say it was more common for it to be
 2   an original or a substituted trustee, one or the other?
 3        A     No.
 4        Q     Okay.
 5        A     Because the only way we would be a trustee on
 6   original documents is if it was individuals doing the
 7   loan, you know, a seller carryback, that sort of thing.
 8   That's the only time we would prepare a note and deed of
 9   trust.  Other than that, it would be institutional
10   lenders.
11        Q     Okay.
12        A     And the majority, at the time when I was
13   there, the institutional lenders had their own trustees,
14   usually in-house companies.
15        Q     Okay.  Got it.
16              So can you explain just kind of generally what
17   was Stewart Title's process when it received a request
18   for a reconveyance?
19        A     Certainly.  If the file was not handy, the
20   file would be ordered from -- if it was in storage or if
21   the main office received a request and the file was out
22   in Douglas, they would request that file.
23              And then they would again review the documents
24   that were surrendered to them, should be the original
25   deed of trust -- not -- if not the original, a certified
```



1   copy of it with recording information on it, the

2   original note, original request for full reconveyance.

3        Q    Now, when you say they, do you mean the escrow

4   officer?

5        A    It depends on what -- where it was going

6   within the Stewart offices.

7        Q    Okay.

8        A    But, yeah.  If it went to the original

9   officer, that would be fine.  If this went to the title

10  department, they would send it out to the office that

11  originated the file.

12       Q    Okay.  And your role in the process was, and

13  you can correct me if I'm wrong, was once you received

14  all of the documents that were part of the reconveyance

15  request --

16       A    Uh-huh.

17       Q    -- you would -- if the reconveyance needed to

18  be filled out, you would fill it out, or you would just

19  process the recordation of the reconveyance?

20       A    I would process the recording.

21       Q    Now, so you would --

22       A    I would sign it and then --

23       Q    So you would receive the completed

24  reconveyance, you would sign it, and then facilitate

25  getting it recorded?



1       A    But I would verify documentation to back up

2    that reconveyance.

3       Q    So when you signed the reconveyance, you would

4    verify that you had the original note, all of the items

5    you listed --

6       A    Yes.  Yes.

7       Q    -- and would you also verify what was already

8    filled out in the reconveyance was accurate, or would

9    you just assume whoever filled it out before you

10   accurately did it?

11      A    If I didn't have backup information on that, I

12   would assume that it was correct because it came from

13   the escrow that did the original escrow --

14      Q    Okay.

15      A    -- that did the transaction.

16      Q    Okay.  Now, I know you threw out some names

17   previously.

18           But who else that currently works at Stewart

19   Title would have information who would be able to

20   discuss this process of how the lien reconveyances are

21   handled?

22      A    I would imagine anybody at the title company.

23      Q    Okay.

24      A    I mean at the title office in Carmichael.

25      Q    Okay.  Now, the process that you've just



1    described -- that we've kind of talked about and you

2    described regarding how the lien reconveyances were

3    processed --

4        A    Uh-huh.

5        Q    -- is it generally the same if Stewart Title

6    is the originating trustee or the substituted trustee?

7        A    Yes.

8        Q    The only difference would be there's the extra

9    document of the substitution of trustee?

10       A    Yes.

11       Q    Would there be a notation in Stewart Title's

12   business records if it received a request for a

13   reconveyance, like a electronic notation?

14       A    Not that I'm aware of.

15       Q    So it would just be a physical paper file?

16       A    Yes.

17       Q    And that would be the same whether it's the

18   originating trustee or the substituted trustee?

19       A    Yes.

20       Q    So it sounds to me once the reconveyance

21   request -- once the lien reconveyance is requested, the

22   process might change based on whether the lender

23   provides the executed reconveyance or whether they've

24   asked Stewart Title to handle that and fill it out and

25   verify all of the documentation is received?



1      A    Yes.

2      Q    So in your experience, if Stewart Title was

3  not the originating trustee, would it record a lien

4  reconveyance without a recorded trustee -- substitution

5  of trustee?

6      A    Not that I'm aware of.

7      Q    So when you received the request to execute

8  the full reconveyance --

9      A    Uh-huh.

10      Q    -- would you make sure you had a copy of an

11  executed -- of a recorded substitution of trustee, or

12  did it just need to be executed and then you would

13  record the executed substitution of trustee?

14      A    It would either be the case normally where we

15  would have the original substitution of trustee to

16  record or be provided a certified copy of the one that

17  has recorded.

18      Q    And so if you received a substitution of

19  trustee that was not recorded but it was the original to

20  record --

21      A    Yes.

22      Q    -- you would -- you would record that before

23  or after the full reconveyance was recorded or --

24      A    Prior to.

25      Q    Prior to?



1       A    Yes.

2       Q    Okay.  And then if Stewart Title received a

3  request to reconvey a lien and it was not the

4  originating trustee and there was no recorded

5  substitution of trustee on record, would Stewart Title

6  prepare a substitution of trustee?

7       A    It's possible.

8       Q    So in some cases it would?

9       A    Yes.

10      Q    And in other cases, maybe the beneficiary had

11  prepared the substitution of trustee?

12      A    Possibly.

13      Q    Okay.  Did you ever personally prepare the

14  substitution of trustees if one needed to be done before

15  a lien reconveyance?

16      A    If I did, it was only at the request of the

17  lender.

18      Q    So was there --

19      A    But, no.

20      Q    Would -- so would you say, generally, most of

21  the time, if Stewart Title -- if there was a

22  substitution of trustee that subbed in Stewart Title,

23  one was already prepared before it got to you?

24      A    Yes.  I'm sorry.  You got that -- if it was an

25  institutional lender, yes.



```
 1          Q     Okay.  And if it wasn't an institutional

 2   lender --

 3          A     If it was an individual, not necessarily.

 4          Q     So if it was an individual, there may be cases

 5   where you would receive the file and you would have to

 6   prepare the substitution of trustee?

 7          A     But that would be rare because normally they'd

 8   go back to -- the documents would go back to where the

 9   original escrow was, and that may not be the case.

10          Q     Okay.  Were there other -- was there ever

11   times when either you or Stewart Title inadvertently

12   recorded documents without the authority to do so?

13          A     I'm sure.

14          Q     Do you recall --

15          A     I mean not that I'm aware of specifically.

16   But that's kind of the nature of -- it just happens

17   sometimes with title companies.

18          Q     You mean just in this sort of industry

19   mistakes happen and it's just part of the --

20          A     I think everyone is a human being, and human

21   beings make mistakes.

22          Q     Now, you indicated previously that generally

23   the full reconveyance had been prepared before it got to

24   you, and you would generally sign it and then process

25   the recording of it?
```



REGINA K. GARLAND
NATHAN L. TOPOL

1          A    Right.

2          Q    And so would you -- and I -- I -- just for

3    clarification purposes, would you go back and verify

4    that the full reconveyance referred to the correct

5    trustee, the correct date of the deed of trust, the

6    correct serial number of the deed of trust and so on, or

7    would you rely on whoever prepared it before you that it

8    was accurate?

9          A    A little bit of both.  But I would have -- in

10   order to sign one, it was common practice that I had all

11   the documents there to look at, so I would rifle through

12   those.

13         Q    Okay.

14         A    Look through them.

15         Q    And then prior to you recording the

16   reconveyance, was there -- since you were the office

17   manager, was there anybody -- supervisor or anybody

18   above you that would do a final check before it was

19   recorded, or were you kind of the last person to review

20   it?

21         A    It's depends on which office it came from.  If

22   it was in-office, I would send it back to the -- if it

23   was the escrow officer in our office, it would go back

24   to her to record.

25         Q    Okay.



REGINA K. GARLAND
NATHAN L. TOPOL

1      A    Not necessarily to be checked, but just to get

2  it recorded.  And then if it came from another office,

3  it would go back to them for recording.

4      Q    Okay.

5      A    That way they had the documents in their

6  file -- copy in their file when they sent the original

7  up to record.

8      Q    So under either scenario after you executed it

9  you would send it back to someone else to record it?

10     A    If it was not in my office, yes.

11     Q    Okay.

12     A    Yeah.

13     Q    Now, I know you went through the checklist of

14  items that you would require --

15     A    Uh-huh.

16     Q    -- and Stewart Title would require to record a

17  reconveyance.

18          Was this a law that you were aware of, or was

19  this just Stewart Title's policy to require these

20  certain documents before recording, executing a

21  reconveyance?

22     A    It's common practice in the industry.

23     Q    Okay.  And based -- to the best of your

24  knowledge, did you ever execute a reconveyance without

25  having all of those items?



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

73

```
 1        A     No.

 2        Q     To the best of your knowledge, were you aware

 3   of whether Stewart Title ever executed a reconveyance

 4   without having all those items?

 5        A     No.

 6        Q     And are there any circumstances when it would

 7   not execute a reconveyance without all of those items?

 8        A     I have no idea.

 9        Q     Okay.  But to your knowledge you have never

10   executed a reconveyance without having all of those

11   items?

12        A     As well as I can remember.

13        Q     Okay.  Sure.  Now, once the reconveyance is

14   recorded --

15        A     Uh-huh.

16        Q     -- is there a process by which Stewart Title

17   notifies the beneficiary that's it's been recorded, or

18   does it just rely on the county to mail it a copy?

19        A     It depends on the individual escrow officer

20   that gets the reconveyance back.

21        Q     Okay.

22        A     What she would normally do.  But if it's --

23   yeah -- private parties, then you might do that.  If

24   it's an institution, you might just rely on the county

25   to send the recorded document to them.
```



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    74

1         Q     Okay.  So your role as assistant secretary in

2    this -- in a full reconveyance, you wouldn't -- once

3    you've sent it to get recorded, you wouldn't contact the

4    lender or the beneficiary --

5         A     No.

6         Q     -- to let them know it was recorded?

7         A     No.

8         Q     And so in this case, when you say the escrow

9    officer may notify, that would be Nicole Miller in this

10   case?

11        A     Yes.

12        Q     Okay.  And is Stewart Title paid for preparing

13   a reconveyance?

14        A     Every title company collects a trustee fee.

15        Q     Okay.  And I know you kind of walked through

16   the process of how Stewart Title retains its documents.

17              So just so I'm clear, it -- once the file is

18   completed, it would send the file to Carmichael, which

19   is the main branch.  And then Carmichael would send the

20   file to Iron Mountain to hold for -- in your estimation

21   seven years?

22        A     Okay.  Let me kind of reiterate part of that.

23              If we're receiving a reconveyance in -- or

24   documents into executed reconveyance on an escrow that

25   we held in-office -- say, for instance, this one.  The



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

75

1    original escrow was in 2002.  The request for

2    reconveyance was done in 2004.  That may have

3    actually -- that office -- that file may have actually

4    been in-office still.  So it would go back to the file

5    room within that office.

6        Q    Okay.

7        A    If the file had already been sent to storage,

8    then it would go to -- it would be sent to our main

9    office in Carmichael, and then they would send it out to

10   Iron Mountain or other storage facility at the time.

11       Q    Okay.  Now, just getting to this specific

12   reconveyance.

13            I know you kind of explained the process where

14   once it got to you you had all the documents that were

15   provided by the escrow officer?

16       A    Uh-huh.

17       Q    You make sure the documents were there before

18   you signed the reconveyance?

19       A    Yes.

20       Q    It seemed like it wasn't always clear whether

21   you would rely on what the escrow officer filled out

22   before, or sometimes you would -- you know, even though

23   you had the file right there you would go and verify the

24   recording number, the serial number.  If -- so going

25   back to Exhibit 1.



1          By signing this reconveyance, that would mean

2    that you had verified that you had a -- you had received

3    an executed request for reconveyance from the

4    beneficiary?

5          A    Yes.

6          Q    The original note from the beneficiary?

7          A    Yes.

8          Q    A substituted trustee that substituted in

9    Stewart Title or Sierra Valley?

10         A    Uh-huh.

11         Q    That would -- by executing this that would

12   mean that you had all of these items?

13         A    By executing that it states that I have

14   everything I need necessary to record the full

15   reconveyance.

16         Q    So that would also mean that you verified that

17   Stewart Title was the trustee under the deed of trust?

18         A    Yes.

19         Q    And how would -- would you verify that by

20   seeing if there was a substituted trustee?

21         A    Yes.

22         Q    Would that be the only way you would be able

23   to verify if Stewart Title was the trustee under the

24   deed of trust?

25         A    As far as I know, yes.



REGINA K. GARLAND                                        November 25, 2014
NATHAN L. TOPOL                                                        77

1      Q    Okay.  Sorry.  I don't want to ask you stuff
2  you've already answered.
3      A    That's okay.
4      Q    So I know we went through this a little bit
5  earlier.  Going back to Exhibit 1.
6           The recording date referenced in Exhibit 1 for
7  the deed of trust says December 16th, 2002?
8      A    Yes.
9      Q    Where the actual recording date for the deed
10 of trust was October 16th, 2002?
11     A    Yes.
12     Q    And I think earlier you indicated that was a
13 typo?
14     A    I'm assuming it was a typo.  But, yes.
15     Q    And it also indicates that Sierra -- that --
16 Exhibit 1 also indicates that Sierra Valley is the
17 trustee under the deed of trust.
18          Based on that and because Sierra Valley is not
19 the trustee under the deed of trust, would I -- would
20 the assumption be correct that you saw a substitution of
21 trustee before signing this?
22     A    Yes.  The assumption would be that there was a
23 substitution of trustee.  It might have been of record.
24     Q    Is there a possibility, based on your review
25 of this full reconveyance, that it was not for this deed



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
78

1    of trust?

2         A    I'm sorry?

3         Q    Is there a possibility based on your review of

4    this full reconveyance that it was not intended for

5    Exhibit 2, for the deed of trust?  Could it potentially

6    be that this reconveyance was for another lien or

7    another deed of trust?

8         A    Not that -- not that I would think.  No.

9         Q    Okay.  So your review of this full

10   reconveyance --

11        A    Yeah.

12        Q    -- you believe it was for --

13        A    I can't --

14        Q    -- Exhibit 2?

15        A    Because the recording information, I mean the

16   date was wrong.  The series number is the same.

17        Q    If you were still working for Stewart Title --

18        A    Uh-huh.

19        Q    -- and you had seen a copy of the -- this full

20   reconveyance --

21        A    Uh-huh.

22        Q    -- and you saw that it referenced the wrong

23   recording date --

24        A    Uh-huh.

25        Q    -- would you have done anything to correct it?



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
79

1      A      I would probably check with Citibank because

2  they would have the original mailed to them to see if

3  they wanted it rerecorded to correct that date.

4      Q      And then if they said, No, it's not a big

5  deal, don't worry about it, you wouldn't have done it?

6      A      No.

7      Q      Okay.

8      A      If the series number wasn't on there, then we

9  would have had to.

10     Q      I know you previously indicated you didn't

11  know any of the Topols, you didn't recognize this file

12  other than, you know, it looks like your signature?

13     A      Uh-huh.

14     Q      Do you recall if you were ever contacted by

15  anybody regarding this reconveyance indicating it

16  shouldn't have been recorded?

17     A      No, I don't remember.

18     MR. HARRIS:  Other than my office.

19     THE WITNESS:  Oh.  Other than Norma.  Yes.  No.

20  BY MR. McDERMOTT:

21     Q      Okay.  All right.  Just a few more questions.

22            During your tenure at Stewart Title, did you

23  ever mistakenly record any documents?

24     A      I'm sure.

25     Q      Were you alerted --

1   A   I don't remember but --

2   Q   Well, were you alerted -- if you did make the

3   mistakes, were you alerted to those mistakes?

4   A   Oh, absolutely.

5   Q   So, generally, you can recall instances where

6   you recorded a document that shouldn't have been

7   recorded and you were alerted of it?

8   A   Sure.

9   Q   And then in those instance what -- how -- what

10  did you do to correct the situation?

11  A   Either we were able to obtain the original

12  document to rerecord it, or to record a new document to

13  replace that document.

14  Q   Okay.  Do you recall if you ever recorded a

15  full reconveyance where it shouldn't have been recorded?

16  A   I don't remember.

17  Q   Do you recall if anybody at Stewart Title

18  while you were there, not you, recorded a full

19  reconveyance and it shouldn't have been recorded?

20  A   I honestly don't remember.

21  Q   Okay.  And when -- in the instances where you

22  recorded something and it may have contained a mistake,

23  generally how were you alerted of those mistakes?

24  A   If it didn't come from the county, which by

25  that point it would be too late to do anything about the

1    document unless they caught it before it physically

2    recorded, because they review documents too, then, if

3    the principal involved, once they received whatever

4    document it was, if they noticed it they would take care

5    of it then.

6         Q    Okay.  So it would generally come from like

7    the beneficiary or the lender or --

8         A    Yes.

9         Q    Okay.  And then it would be up to them whether

10   they wanted to take any action to correct the mistake?

11        A    Yes.

12        Q    During your tenure at Stewart Title, do you

13   recall ever working regularly with anybody at

14   CitiMortgage?

15        A    No.

16        Q    Do you recall working regularly with anybody

17   at CitiMortgage regarding reconveyance requests?

18        A    No.

19        Q    Do you recall how -- well, specifically, for

20   CitiMortgage, would they be one of these institutional

21   lenders that would provide, generally, an executed

22   reconveyance, or would they ask Stewart Title to prepare

23   and execute the reconveyance?

24        A    Most it's -- I'm going to give you kind of a

25   general answer.



1        Q      Sure.

2        A      But most institutional lenders prepare their

3   own.

4        Q      So -- and you -- in your estimation Citi was

5   one of those lenders that would generally prepare their

6   own?

7        A      I honestly don't know.

8        Q      Okay.

9        A      And I can assume so, but I don't know for

10  sure.

11       Q      Okay.

12       A      Long time ago.

13       Q      Sure.  No.  No. I -- I -- yeah.

14              During your tenure at Stewart Title, were you

15  ever disciplined or reprimanded for any errors or

16  mistakes?

17       A      I'm sure I was.

18       Q      Do you recall any of those specific instances,

19  or do you just remember --

20       A      No.

21       Q      -- it occurred at some point?

22       A      I'm sure I made mistakes.

23       Q      Well, were you ever disciplined or reprimanded

24  for those mistakes?

25       A      Other than somebody talking to me about it.  I



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

83

```
 1    mean that's --
 2          Q    Who would have --
 3          A    -- I'm assuming.
 4          Q    Who would have talked to you about it?
 5          A    This is all going off of an assumption --
 6          Q    I know it's a long time ago.  Yeah.  Yeah.
 7          A    Well, it would have been either my immediate
 8    supervisor, who was the county manager, Clark Davenport.
 9    I don't believe the president of the company or anything
10    ever reprimanded me.
11          Q    And did you say Clark Davenport was still --
12          A    He's still there.
13          Q    -- still there?
14          A    Yes.
15          Q    And what was his title again?
16          A    He's now county manager of all Sacramento and
17    Placer County operations.
18          Q    And what office is he located in?
19          A    He's in one of the Roseville offices.
20          Q    Okay.
21          A    I can give you the phone number.  I think you
22    can get him through the other office I used to be in.
23          Q    Okay.
24          A    But it's (916)783-8845.
25          Q    Okay.  Now, I know you indicated that you were
```



REGINA K. GARLAND                                          November 25, 2014
NATHAN L. TOPOL                                                          84

1    an office manager at Stewart Title for about 25 years,
2    right?
3         A    Yes.
4         Q    Were you ever promoted or advanced within
5    Stewart Title due to your performance?
6         A    Well, when I went to work there, I was a
7    branch manager/office manager.  So that was kind of as
8    high as you could go there.  I was -- other than given
9    the title of assistant secretary, I think I was a vice
10   president for a while.
11        Q    Okay.
12        A    That sort of thing.
13        Q    And then I think my last question, so you
14   indicated you retired from Stewart Title in 2010, right?
15        A    Yes.
16        Q    And that was just retirement.
17             You were --
18        A    Actually, I was technically laid off.
19        MR. McDERMOTT:  Okay.  All right.  Well, I think
20   those are all the questions I have.
21        THE WITNESS:  Okay.
22        MR. DEMETRAS:  So I have a couple questions.
23        THE WITNESS:  Certainly.
24   ///
25   ///



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

85

```
 1                      EXAMINATION
 2    BY MR. DEMETRAS:
 3         Q    We're all confused about the file and where it
 4    went.
 5              So if you look at Exhibit 2, the deed of
 6    trust, handwritten is this file number.  All right.
 7              And so could you tell me again what's the 34?
 8         A    The 34 designates the branch in Roseville,
 9    because we had more than one branch number.
10         Q    And the 50 --
11         A    Oh, I'm sorry.  The 506527?
12         Q    That's the file?
13         A    That's the actual escrow number, file number.
14         Q    Okay.  So in 2002 there was then an actual
15    file that had, what, the original note?  What would be
16    in the original file in 2002?
17         A    Okay.  This appears to have been an
18    institutional lender, so the original note would have
19    gone back to the lender as well as all the original
20    documents except the deed of trust.  That would have
21    been recorded through this file at the county.  And a
22    copy of all the other documents would be in the file.
23         Q    So your file then would have a copy of all the
24    original documents?
25         A    Yes.
```



REGINA K. GARLAND
NATHAN L. TOPOL

1    Q    And a deed of trust?

2    A    Yes.

3    Q    All right.  So then two years later there's

4    this reconveyance, right?

5    A    Yes.

6    Q    And it's in the same office with the same

7    people?

8    A    I don't believe they actually did the escrow,

9    because I'm also seeing this number here, which I don't

10   recognize.

11   Q    Which number is that?

12   A    I'm sorry.  It's under all of the addresses on

13   the deed of trust on Item 2.

14   Q    Right.

15   A    It's 022107722-RR --

16   Q    Yes.

17   A    That, to me, and I don't know for sure, looks

18   like another escrow officer but from another company.

19   I'm just not sure what that number is.

20        The documents, again, would have been

21   surrendered as the trustee, which doesn't show on there,

22   for issuance, so . . .

23   Q    So in looking at this deed of trust, can you

24   tell where the documents were, the copies of the

25   documents?  Were they at Sierra Valley with



1   Nicole Miller, or were they with this RR number down

2   here?

3        A    No.   They should be -- the documents on this

4   loan should be at Sierra Valley/Stewart with

5   Nicole Miller -- or in this file, which I understand has

6   now been shredded.

7        Q    Well, that's -- I'm coming to that question.

8        A    Sorry.

9        Q    Okay.  So there's the file?

10       A    Uh-huh.

11       Q    So was there ever a time where you would rely

12   on your staff to do a full reconveyance without looking

13   at the file?

14       A    No.

15       Q    So you would -- before you signed this, you

16   would have looked at your file?

17       A    Yes.

18       Q    Nicole Miller's file?

19       A    Yes.

20       Q    Okay.  And so that's in 2004?

21       A    Yes.

22       Q    And so how long after all these documents were

23   signed -- now, I'm assuming then the file would then

24   have a request for reconveyance -- the file that you had

25   now in addition to those copies of the original loan



1   docs would have these other documents that we have --

2       A    Exactly.

3       Q    -- right?

4       A    Yes.

5       Q    And so every time you did one of

6   these, especially with this one, you would have looked

7   at the file, signed the reconveyance --

8       A    Uh-huh.

9       Q    -- and then given the file back to

10  Nicole Miller?

11      A    Yes.

12      Q    Okay.  So then that's in 2004?

13      A    Yes.

14      Q    Okay.  Then would Nicole Miller send it to

15  storage?

16      A    If there wasn't sufficient room in the office

17  at that time in the file room in the back -- in other

18  words, if she had to get the file from storage, it would

19  go back to storage, yes.

20      Q    But you said earlier it may have still been in

21  the office?

22      A    It could have.  It just depends on how many

23  files they had in the backroom.

24      Q    Okay.

25      A    And I don't remember.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
89

1      Q    So when a file goes back to storage to Iron
2  Mountain --
3      A    Uh-huh.
4      Q    -- is there a person in the office that is in
5  charge of sending files back?  And is there a computer
6  program which lists the file transfers?
7      A    The file when I -- the files when I was there
8  went through a gentleman by the name of Mike Greco --
9      Q    Okay.
10     A    That's G-r-e-c-o.
11          -- at our Stewart office in Carmichael, the
12  main office, the one on Fair Oaks Boulevard.
13     Q    Okay.  So then they would leave -- the file
14  would leave Douglas --
15     A    Uh-huh.
16     Q    -- and go to Carmichael?
17     A    Yes.
18     Q    Okay.  And then from Carmichael, it would go
19  to storage?
20     A    Yes.
21     Q    So Mike Greco in Carmichael would have to
22  notify Iron Mountain to come to pick up the box?
23     A    Absolutely.
24     Q    Right?
25     A    Yes.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

90

1       Q       And so does Iron Mountain have a computer

2   program where they list files going in and out?

3       A       I never saw that, so I don't know.

4       Q       Okay.

5       A       I've never seen that.

6       Q       Would Mike Greco know that?

7       A       He would, but I don't believe he's at Stewart

8   anymore.

9       Q       And where is he now?

10      A       I don't know.

11      Q       Do you know who's in charge of transferring

12  files back and forth to Iron Mountain and Stewart?

13      A       I don't since I've left there.  No.

14      Q       Okay.  So then at some point the file goes to

15  storage off site?

16      A       Yes.

17      Q       Who decides when it's time to shred it?

18      A       I think it's just a housekeeping question --

19  where there is a legality involved I believe it's seven

20  years.  We have to keep it for seven years.

21      Q       Right.  But does someone decide that all files

22  after a certain date are purged?

23      A       Yes.

24      Q       So --

25      A       That's done within the main office.

REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    91

1        Q    So would there be a message from Mike Greco to

2   Iron Mountain, Purge the following files?

3        A    I'm not sure of how they did that actually.

4   Because I know before I left the company they were

5   starting to do that.  But I don't know if they did that

6   in-house in Carmichael or if Iron Mountain did that.

7        Q    All right.

8        A    I wasn't a part of that part of the process.

9        Q    And how do you know that the file's been

10  shredded?

11       A    That's what I was told.

12       Q    Okay.

13       A    When I received phone calls from Norma -- I

14  called the office to find out where this file was, and I

15  was told.  And I think Norma was told that it had been

16  shredded also.

17       Q    So had Norma contacted the Carmichael office?

18       A    I think -- I'm not sure if it was -- I say

19  Norma, but I'm assuming it was Norma.  She talked to

20  somebody in my -- in the Roseville office.  She was

21  talking to Debbie Shefke, which partners with

22  Nicole Miller, the escrow officers on here.

23       Q    What was her name?  Debbie what?

24       A    Debbie, last name is S-h-e-k-f-e -- I'm sorry.

25  I said that wrong.  It's S -- S -- I can't even say it.

1  S-h-e-f-k-e, Shefke.

2      Q    Okay.  Have you talked to anyone to prepare

3  yourself for this depo, or have you talked to anyone

4  about this depo before you came in today?

5      A    No.  Well, let me back up.

6           Mr. Davenport was aware of it.  I did talk to

7  him.

8      Q    And who is Mr. Davenport?

9      A    Oh.  Clark Davenport.  He's the county manager

10  for Stewart Title for Placer County and Sacramento

11  Counties.

12      Q    All right.

13      A    But there was no preparation done.

14      MR. HARRIS:  And then, Craig, just so you know,

15  Norma called her I think two days ago to verify that she

16  was going to come up here, and I think she talked to her

17  a month or two ago about the facts.

18      THE WITNESS:  Yes.

19  BY MR. DEMETRAS:

20      Q    And how long ago did you hear that the file

21  was shredded?

22      A    Oh.  That would have been after the first

23  phone call from Norma.  A couple months ago I would say.

24  That's just a guess though.

25      MR. HARRIS:  Also, I think CitiMortgage tried to --



1    I think CitiMortgage subpoenaed the documents, and I

2    think they were told that the documents had been

3    destroyed.

4        MR. McDERMOTT:  I think that's right.  Yeah.

5        MR. DEMETRAS:  And when did you subpoena them?

6        MR. McDERMOTT:  I'm not sure.  I can let you know,

7    but I'm not entirely sure.  I don't know -- I think we

8    subpoenaed Sierra Valley and the response to the

9    subpoena was from Stewart title.  I don't think we

10    reached out to Iron Mountain.

11        MR. DEMETRAS:  Oh, okay.

12    BY MR. DEMETRAS:

13        Q    So not to keep beating the dead horse here.

14            But so you would have had a copy of the

15    original note in your file?

16        A    Yes.

17        Q    And the original note would have been at

18    CitiMortgage?

19        A    I'm sorry.  Are you talking about in the

20    original escrow file?

21        Q    For the reconveyance.

22        A    On the reconveyance.

23            Normally that original note is surrendered to

24    us if we're the trustee.  Normal practice anyway.

25        Q    But here you don't remember if that's true



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
94

1  here?

2      A    No.  I don't remember signing this.  So, no.

3      Q    Is there ever a situation where you would --

4  where CitiMortgage would reconvey the lien, the deed of

5  trust but keep the note as an unsecured note?

6      A    Not that I'm aware of.

7      Q    So in your experience then a reconveyance, you

8  would have the note, the note would have been paid off

9  in full, and there would have been a request for

10  reconveyance before you signed this; is that true?

11      A    Yes.  Or the lender in this -- if we didn't

12  have a substitution of trustee would have just sent us a

13  full reconveyance to record.  We wouldn't be aware of

14  what the terms are or if the note is still in effect or

15  any of that.

16      MR. DEMETRAS:  Okay.  That's all the questions I

17  have right now.

18      MR. HARRIS:  Let's just take a quick break.  Five

19  minutes, and then just wrap it up.

20      THE WITNESS:  Okay.

21                  (Brief recess taken.)

22

23                  FURTHER EXAMINATION

24  BY MR. HARRIS:

25      Q    Just a couple of clarifying points.



REGINA K. GARLAND
NATHAN L. TOPOL

1        A    Yes.

2        Q    On the full reconveyance, which is Exhibit 1,

3   on the escrow number it starts out, as you said, DG,

4   which is the Douglas location.  And it says 54.  And

5   then on the deed of trust it says 34.

6             What's the difference between 34 on the deed

7   of trust and 54 on the full reconveyance?

8        A    The -- our computer system is probably the

9   difference.  The 34 is what we were designated while we

10  were Sierra Valley Title.

11       Q    Right.

12       A    When it went to Stewart, even though we're

13  still doing a Sierra Valley reconveyance, it was

14  designated as 54.

15       Q    Okay.

16       A    So it was the computer thing.

17       Q    Okay.  So --

18       A    As far as I remember.

19       Q    So how would -- how would your office go about

20  recording a full reconveyance?  Would you send it by

21  delivery, messenger to the title company?  Do you have a

22  runner that works in-house?  How would it happen?

23       A    We have a courier.  I'm sorry.  We had a

24  courier -- or they have a courier.  I'm not there.  The

25  courier would take it directly up to the county.



REGINA K. GARLAND
NATHAN L. TOPOL

1       Q      Okay.  Sierra, slash, Stewart?

2       A      Uh-huh.  Yes.  Yeah.

3       Q      And do you know if they had any kind of -- did

4    these couriers have any kind of log-in system if they

5    got documents, would they give you receipts for it, or

6    would they just pick up the documents, no accounting for

7    them, and take them down to recording?

8       A      They pick up the documents in a recording bag,

9    and then it goes up to -- it would go up to our Auburn

10   office -- I'm sorry -- not our Auburn office.  The

11   Placer County Recorder's Office.  We had a desk in there

12   with a person that would then take the documents and

13   physically record them at the counter.

14      Q      Somebody from the county?

15      A      Right.

16      Q      Okay.  When the county is recording -- when a

17   county employee is recording a full reconveyance, do

18   they have a process to check to see if the trustee

19   signing on the full reconveyance is, in fact, the

20   trustee of record?

21      A      Not that I'm aware of.  I don't believe so.

22      Q      So as far as you know they don't have any sort

23   of cross-check to see if the trustees are one in the

24   same?

25      A      Not that I know of.



1        Q     Okay.  Do you know if -- do you know if

2    CitiMortgage would have recorded its own substitution of

3    trustee, or would they have asked you to record their

4    substitution of trustee?

5        A     They could have recorded their own.  It was

6    not uncommon of -- for institutional lenders to do that.

7        Q     Had you ever done much CitiMortgage

8    recordations on CitiMortgage Loans, Citibank loans

9    before?

10       A     I never did.  No.

11       Q     I think that's all I -- did you have -- oh.

12             You said you were -- the title -- your company

13   was paid a fee to do the full reconveyance?

14       A     Uh-huh.  Yes.  It's -- it's standard practice

15   in the industry that there's a trustee fee collected for

16   preparing and recording a reconveyance.

17       Q     Do you know how much that fee was?

18       A     It used to be $45.

19       Q     Okay.  Did you record in your branch office

20   the income and the expenditures for your office

21   location?

22       A     No.

23       Q     Who would record, let's say, this $45 fee or

24   whatever the fee was to do the full reconveyance?

25       A     That should have gone back to the original

REGINA K. GARLAND
NATHAN L. TOPOL
November 25, 2014
98

1   file.

2       Q    Okay.  And then from the original --

3       A    So if it was done, it would have been done by

4   Nicole.

5       Q    Okay.  And then that would have somehow been

6   billed by Nicole on behalf of the title company?

7       A    Well, it would have been -- it depends on

8   where -- I'm sorry.  Let me back up.

9            When we received the documents, depending upon

10  where they come from, if it's another title company that

11  pays off the actual deed of trust and they send us the

12  documentation in order to reconvey it, they'll usually

13  send a check up front.

14           But if it's an institutional lender, sometimes

15  we would bill them, or not, and just not collect one.

16      Q    Would there be any electronic records of in

17  this instance Citibank, CitiMortgage being billed for a

18  reconveyance?

19      A    There might be an invoice in the file, but

20  nothing electronic.

21      Q    Did -- would your office back in January of

22  2004 make a practice of scanning records into the

23  computer system?

24      A    I don't believe we had a scanner then.  So,

25  no.



REGINA K. GARLAND
NATHAN L. TOPOL

1      Q      When do you think you had a scanner?

2      A      I know we were using scanners when I left.

3  But it had been a few years that we had been using them,

4  so I don't even know exactly when.  We were a little bit

5  behind in technology.

6      Q      So you don't believe you had a scanner in 2004

7  available in your office?

8      A      No.

9      Q      And then I don't think I have -- one last

10  question.

11     A      Yes.

12     Q      And in your 25-year-plus title company

13  history, have you ever examined a recorded reconveyance

14  that was subsequently, after recordation, deemed to have

15  been altered in any way?

16     A      No.

17     MR. HARRIS:  I have nothing further.

18

19              FURTHER EXAMINATION

20  BY MR. McDERMOTT:

21     Q      Just one question.

22             So for this reconveyance, assuming that there

23  was no substitution of trustee that subbed in,

24  Sierra Valley Title would have been the trustee?

25     A      Yes.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014

100

1        Q     And assuming that Sierra Valley Title never
2    received the original note from Citi --
3        A     Uh-huh.  Yes.
4        Q     -- would you agree that Sierra Valley Title
5    and you didn't have authorization to execute this
6    reconveyance?
7        A     I'd rather not answer that.  No.  It sounds
8    like I don't have -- I didn't have authorization.  I
9    don't know.
10       Q     So you don't know if you -- if Sierra Valley
11   would or would not have authorization if it didn't have
12   those items?
13       A     Right.
14       Q     This is just assuming you didn't have those
15   items.
16       A     Right.  I wouldn't have signed one if it
17   didn't have those items.
18       Q     And you wouldn't have signed it if you didn't
19   have those items because it's -- it was the business
20   norm, part of the industry that you have those items
21   before signing this?
22       A     Absolutely.
23       Q     But you don't know if you wouldn't be
24   authorized to sign it without those items?
25       A     Right.

REGINA K. GARLAND
NATHAN L. TOPOL

1        MR. McDERMOTT:  Okay.

2

3                    FURTHER EXAMINATION

4   BY MR. DEMETRAS:

5        Q    So you would be authorized to sign a

6   reconveyance if you didn't have those items?  Is that

7   what you said?

8        A    No.  I --

9        Q    Yeah.  Sorry.

10        A    I guess I did.

11        Q    Yeah.

12        A    I guess there could have been an instance

13   maybe if the main office said they've got documents.  I

14   don't -- I don't recall anything like that though.

15        MR. HARRIS:  Her words were, Does not know if

16   authorization to sign without these items.

17        THE WITNESS:  Okay.

18        MR. HARRIS:  She does not know if she had

19   authorization to sign without these items.

20        THE WITNESS:  It was not a normal, common practice.

21   It would be -- it would be something unusual.

22   BY MR. DEMETRAS:

23        Q    Could you sign this legally without those

24   items?

25        A    I wouldn't sign it without the items.



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
102

1       Q    Okay.

2       A    I mean I guess you could sign anything, but I

3   wouldn't, nor did I ever in 35 years in the business do

4   that.

5       MR. HARRIS:  Thirty-five.  Not -- sorry.

6       THE WITNESS:  It was only 25 at Stewart.

7       MR. HARRIS:  Anything else?

8       MR. McDERMOTT:  I don't have anything.

9       THE REPORTER:  Mr. Demetras, would you like a copy

10  of the transcript?

11      MR. DEMETRAS:  Yes.

12      THE REPORTER:  And, Mr. McDermott, would you like a

13  copy of the transcript?

14      MR. McDERMOTT:  Yes, please.

15      (Deposition session concluded at 3:29 p.m.)

16                       -oOo-

17

18

19

20

21

22

23

24

25



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
103

DEPOSITION ERRATA SHEET

Our Assignment No.: 239769

Case Caption: In Re:  Nathan L. Topol, debtor


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


Signed on the _____ day of

_____, 20_____.


_____
       Regina K. Garland



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
104

1   DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE: _____  DATE:_____
                Regina K. Garland
25



REGINA K. GARLAND
NATHAN L. TOPOL

November 25, 2014
105

1         DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

     _____
4
     Reason for change:_____
5
     Page No._____Line No._____Change to:_____
6

7    _____

8    Reason for change:_____

     Page No._____Line No._____Change to:_____
9

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE: _____ DATE:_____
             Regina K. Garland
25



REGINA K. GARLAND                                    November 25, 2014
NATHAN L. TOPOL                                                    106

```
 1    STATE OF CALIFORNIA    )
                             )    ss.
 2    COUNTY OF SACRAMENTO   )

 3

 4         I, Mark S. Patterson, a licensed Certified

 5    Shorthand Reporter, duly qualified and certified as such

 6    by the State of California, do hereby certify:

 7         That prior to being examined, the witness

 8    named in the foregoing deposition was by me duly sworn

 9    to testify to the truth, the whole truth, and nothing

10    but the truth;

11         That the said deposition was by me

12    stenographically recorded at the time and place first

13    herein mentioned; and the foregoing pages constitute a

14    full, true, complete and correct record of the testimony

15    given by said witness;

16         That I am a disinterested person, not being in

17    any way interested in the outcome of said action nor

18    connected with, nor related to any of the parties in

19    said action, or to their respective counsel, in any

20    manner whatsoever.

21         IN WITNESS WHEREOF, I have hereunto set my

22    hand this 4th day of December, 2014.
```



```
24    _____
      Mark S. Patterson, CSR No. 12432
25
```

# EXHIBIT D

Eddie R. Jimenez (SBN 10376)
ejimenez@piteduncan.com
Ace Van Patten (SBN 11731)
avanpatten@piteduncan.com
**PITE DUNCAN, LLP**
520 South 4th St., Suite 360,
Las Vegas, NV 89101
Telephone: (858) 750-7600
Facsimile: (619) 590-1385

Attorneys for CitiMortgage, Inc.

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA – RENO DIVISION

| | |
|---|---|
| In re | Case No. 12-51014-btb |
| NATHAN L. TOPOL, | Chapter 7 |
| Debtor. | **NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY** |

**TO ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that, on June 24, 2014, CitiMortgage, Inc., by and through undersigned counsel, will cause the attached subpoena to be served on Sierra Valley Title Company.

Respectfully submitted,

**PITE DUNCAN, LLP**

Dated: June 24, 2014

/s/ Eddie R. Jimenez
EDDIE R. JIMENEZ
Attorneys for CitiMortgage, Inc.

# EXHIBIT E

**Steve Harris**

| | |
|---|---|
| **From:** | Eddie R. Jimenez <ejimenez@piteduncan.com> |
| **Sent:** | Monday, June 30, 2014 3:32 PM |
| **To:** | Steve Harris |
| **Subject:** | RE: Nathan L. Topol Chapter 7 Case - Objection to CitiMortgage Proof of Claim |
| **Attachments:** | Sierra Valley Title Subpoena.pdf |

Hello Steve,

The subpoena is attached. Also, my hearing for tomorrow was continued to July 29th. If you are available, we can have lunch then. Talk to you soon.

**Eddie R. Jimenez**
*Partner*
**Pite Duncan, LLP**
Main Office: (858) 750-7600
Direct Dial: (858) 750-7612
Direct Fax: (619) 590-1385
ejimenez@piteduncan.com
www.piteduncan.com
**Arizona | California | Hawaii | Idaho | Nevada | Oregon | Texas | Utah | Washington**

**From:** Steve Harris [mailto:steve@harrislawreno.com]
**Sent:** Wednesday, June 25, 2014 4:04 PM
**To:** Eddie R. Jimenez
**Subject:** RE: Nathan L. Topol Chapter 7 Case - Objection to CitiMortgage Proof of Claim

Hi Eddie –

I note that you filed a Notice of Intent to Serve Subpoena on Non-Party (Doc. 905). The Subpoena that is referenced in the Notice was not attached to the filed Notice, so please provide me with a copy of that proposed Subpoena.

Thank you,
Steve

# Stephen R. Harris, Esq.
## Harris Law Practice LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
775-786-7600

steve@harrislawreno.com

**From:** Eddie R. Jimenez [mailto:ejimenez@piteduncan.com]
**Sent:** Wednesday, June 25, 2014 12:40 PM
**To:** Steve Harris
**Subject:** RE: Nathan L. Topol Chapter 7 Case - Objection to CitiMortgage Proof of Claim

1

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)

# UNITED STATES BANKRUPTCY COURT

District of **Nevada**

In re **Nathan Topol**

_____
Debtor

*(Complete if issued in an adversary proceeding)*

_____

_____
Plaintiff

v.

_____
Defendant

Case No. **12-51014-btb**

Chapter **7**

Adv. Proc. No. _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: **Sierra Valley Title Company**

*(Name of person to whom the subpoena is directed)*

[X] *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **See Attachment A**

| PLACE | DATE AND TIME |
|---|---|
| 4375 Jutland Drive, San Diego, CA 92117 | July 8, 2014 |

[ ] *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* **CitiMortgage, Inc.** , who issues or requests this subpoena, are:

Pite Duncan, LLP c/o Eddie R. Jimenez, 4375 Jutland Dr., Suite 200, San Diego, CA 92117, ejimenez@piteduncan.com (858)750-7612

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

Additional information concerning attempted service, etc.:

## ATTACHMENT A

## DEFINITIONS

1.      "YOU," "YOUR," and "YOURS" shall mean SIERRA VALLEY TITLE COMPANY, and agents, representatives, or any other persons and/or entities SIERRA VALLEY TITLE COMPANY is acting on behalf of or person and/or entity acting on SIERRA VALLEY TITLE COMPANY's behalf.

2.      "CITI" shall mean CITIMORTGAGE, INC., CITIBANK, F.S.B., CITIBANK SERVICE CORP., and all successors, assigns, attorneys, agents, employees, representatives, or any other persons acting on its behalf.

3.      The term "PROPERTY" shall refer to the property commonly known as 4250 West Lake Boulevard, Homewood, CA 96141.

4.      The term "NOTE" shall refer to the promissory note executed by NATHAN L. TOPOL on or about October 9, 2002, in the principal amount of $5,500,000.00 in favor of Citibank, F.S.B.

5.      The term "DEED OF TRUST" shall refer to the Deed of Trust executed by NATHAN L. TOPOL on or about October 9, 2002, securing the NOTE and recorded in Placer County on October 16, 2002, as document number 2002-0125157. A copy of the recorded Deed of Trust attached hereto as **Exhibit 1**.

6.      The term "SUBJECT LOAN" or "LOAN" shall refer to the loan NOTE executed by NATHAN L. TOPOL and the DEED OF TRUST executed by NATHAN L. TOPOL on October 16, 2002, and defined herein.

7.      The term "DOCUMENTS" as used herein shall be deemed to mean, without limitation, all papers, notes, records, electronically stored information, e-mails, facsimile, films, photographs, recordings, tapes, transcriptions, books, and other things, whether or not in your possession or under your control, directly or indirectly relating to or pertaining in any way to the subject matters addressed in these interrogatories, and including, but not limited to, all originals,

Page 1 of 4

copies, or other reproductions, whether prepared by handwriting, typewriting, printing, photostating, photographing, electronically stored, or any other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, symbols, or any combination thereof.

8.    "IDENTIFY", when used with respect to a person or entity, shall mean to state

the person's or entity's

    a.  Full name;

    b.  Occupation, or business type if an entity;

    c.  Last known business address and telephone number; and

    d.  Last known residential address and telephone number.

9.    "IDENTIFY", when used to "identify" or for "identification" of a document, shall

mean to state that document's:

    a.  Date;

    b.  Its author, signer, or signers;

    c.  Its addressees;

    d.  The form of the document;

    e.  Its substance; and

    f.  Its present or last-known location and custodian. If any such document was, but is no longer in your possession or control, state what disposition was made of it, the date of the same thing, and the reason for such disposition.

10.   "RELATING TO" and "REFERRING" means mentioning, discussing, evidencing, summarizing, describing, referring to, depicting, embodying, constituting, reporting or in any way involving.

11.    "ALL" and "ANY" shall mean "any and all" and "each and every.

**YOU ARE COMMANDED** to produce any and all documents referring and/or relating to the real property located at 4250 West Lake Boulevard, Homewood, CA 96141 (the "Property"). A copy of the recorded Deed of Trust attached hereto as **Exhibit 1**:

1.    Identify all documents and/or information referring and/or relating to:

    a.    Documents from Citi referring and/or relating to the Property;

    b.    Documents to Citi referring and/or relating to the Property;

    c.    All documents referring and/or relating to the Loan;

    d.    All documents referring and/or relating to authorization from Citi or the appointment by Citi of a substitute trustee for Deed of Trust;

    e.    All documents referring and/or relating to the substitution of trustee for the Deed of Trust;

    f.    All documents referring and/or relating to Nathan L. Topol;

    g.    All documents referring and/or relating to Sierra Valley #34-506527 NM;

    h.    All documents referring and/or relating to Escrow No. DG-54506527-NM;

    i.    Identify all Sierra Valley Title Company employees, past or present, that worked on any documents regarding the Property;

    j.    All documents referring and/or relating to Regina Kay Krahn;

    k.    All documents referring and/or relating to Regina Kay Krahn's authority to sign the Full Reconveyance recorded in Placer County on January 12, 2004, as document number 2004-002629. A copy of the recorded Full Reconveyance attached hereto as **Exhibit 2**;

    l.    All documents referring and/or relating to Cari Lemos as the notary who signed the Full Reconveyance attached hereto as **Exhibit 2**;

    m.    All documents referring and/or relating to the Full Reconveyance attached hereto as **Exhibit 2**;

n.      Identify all Sierra Valley Title Company employees, past or present that were associated with the Property.

o.      All documents referring and/or relating to any request to reconvey the Deed of Trust;

p.      Identify all documents referring and/or relating to any Citi employees and/or persons associated with Citi or acting on behalf of Citi with whom Citi Sierra Valley Title Company interacted in any way with in relation to the loan or any other loans associated with Nathan L. Topol;

q.      All documents referring and/or relating to any request from Citi to reconvey the Deed of Trust;

r.      All documents prepared by the law firm of Jones Vargas referring and/or relating to the Loan

In the event that you do not have any records for the Property or any responsive information/documents to the above requests, please provide:

s.      A written statement that you have no records referring or relating to the Property;

t.      A written statement that you have no records and/or information from Citi requesting the reconveyance of the Deed of Trust.

RECORDING REQUESTED BY
SIERRA VALLEY TITLE CO.

PLACER, County Recorder
JIM MCCAULEY Co Recorder Office
DOC- 2002-0125157
Check Number  11330cg
Wednesday, OCT 16, 2002 09:16:41
REC   $17.00 MIC    $3.00 AUT   $15.00
SBS   $14.00
Ttl Pd    $49.00         Nbr-0000708874
                           rec/R2/1-15

*Sierra Valley #34-506527 NM*

Recordation Requested by:
Citibank, F.S.B.
12855 North Outer Forty Drive
Saint Louis, MO  63141

When Recorded Mail to:
Citibank, F.S.B.
c/o CitiMortgage, Inc.
P.O. Box 9206, MS 81026
Farmington Hills, MI  48333-9206
Send Tax Notices to:
Citibank, F.S.B.
P.O. Box 790009
Saint Louis, MO  63141

REDACTED

------------------[Space Above This Line For Recording Data]------------------

Loan No: REDACTED

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated October 9, 2002, together with all Riders to this document.
(B)    "Borrower" is Nathan L. Topol, a married man as his sole and seperate property.  Borrower is the trustor under this Security Instrument.
(C)    "Lender" is Citibank, F.S.B..  Lender is a Savings Bank organized and existing under the laws of the United States.  Lender's address is 1 Court Square, Floor 20, Long Island City, NY   11120.  Lender is the beneficiary under this Security Instrument.
(D)    "Trustee" is Citibank Service Corp, A California Corporation.
(E)    "Note" means the promissory note signed by Borrower and dated October 9, 2002.  The Note states that Borrower owes Lender Five Million Five Hundred Thousand Dollars (U.S. $5,500,000.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2032.

EXHIBIT 1

(F)    "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s): |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    "**Escrow Items**" means those items that are described in Section 3.

(M)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    "**Periodic Payment**" means the regularly scheduled amount due for: (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)    "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **PLACER**, California:
**See Attached Legal**

EXHIBIT 1

which currently has the address of 4250 West Lake Boulevard, Homewood, CA  96141 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
    **2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.
    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.
    **3.  Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to

EXHIBIT 1

pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

EXHIBIT 1

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower futher agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
C3005 - 01/11/2001          8827]                    Page 5 of 11

Form 3005 1/01
Initials: _____

EXHIBIT 1

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed ''captive reinsurance.'' Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

C3005 · 01/11/2001        36827]        Page 6 of 11

Form 3005 1/01

Initials: _____

EXHIBIT 1

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. ''Opposing Party'' means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

EXHIBIT 1

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

EXHIBIT 1

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender selection to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

EXHIBIT 1

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                                    _Nathan L. Topol_ (Seal)
                                                                    Nathan L. Topol                    -Borrower

_____

GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal reads as follows:
Name of Notary _Louise Ann Hoyer Barnes_
Date Commission Expires _4-14-03_
County of Commission _Washoe_                    Commission #
State of Commission _NV_                    Mfg. ID. #
_10/13/02_                    Signature _____
                    _Auburn, Ca_                    (Firm name, if any)

——————— [Space Below This Line For Acknowledgment] ———————
## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF _Nevada_                                        )
COUNTY OF _Washoe_                                        ) SS
                                                        )

On _October 9, 2002_, before me, _Louise Ann Hoyer Barnes_,
personally appeared _Nathan L. Topol_                                        , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Signature                    LOUISE ANN HOYER BARNES
                    Notary Public - State of Nevada
                    Appointment Recorded in Washoe County
                    No. 99-56809-2 · Expires April 14, 2003

                                                        (Seal)

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3005 1/01
C3005 - 01/11/2001        [6827]                    Page 11 of 11                    Initials: _____
(c) 2002 Harland Financial Solutions, Inc. All Rights Reserved. SMARTOrigination version 2.9.1.02

EXHIBIT 1

Loan No.: REDACTED

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **Ninth** day of **October, 2002**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, or Security Deed (the ''Security Instrument'') of the same date given by the undersigned (''Borrower'') to secure Borrower's Fixed/Adjustable Rate Note (the ''Note'') to Citibank, F.S.B. (''Lender'') of the same date and covering the Property described in the Security Instrument and located at:

4250 West Lake Boulevard, Homewood, CA 96141
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
### A.  ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of **5.375%**. The Note provides for changes in the initial fixed rate to an adjustable interest rate, as follows:
### 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **November, 2007**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a ''Change Date.''
#### (B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The ''Index'' is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the ''Current Index.''

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
#### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two & 875/1000** percentage points (**2.875%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-- ONE-YEAR TREASURY INDEX--Single Family--Fannie Mae Uniform Instrument
C3182 - 01/15/2001      8271]                   Page 1 of 3                         Form 3182  1/01
                                                                                   Initials:

EXHIBIT 1

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.375%** or less than **3.375%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **10.375%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

**1.** Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall be in effect as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2.** When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-- ONE-YEAR TREASURY INDEX--Single Family--Fannie Mae Uniform Instrument

C3182 - 01/15/2001    (6827)              Page 2 of 3                       Form 3182 1/01
                                                                           Initials: _____

EXHIBIT 1

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_(signature)_ (Seal)
Nathan L. Topol                                              -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-- ONE-YEAR TREASURY INDEX--Single Family--Fannie Mae Uniform Instrument
C3182 - 01/15/2001    [        6827]              Page 3 of 3                          Form 3182 1/01
(c) 2002 Harland Financial Solutions, Inc. All Rights Reserved. SMARTOrigination version 2.9.1.02

14

EXHIBIT 1

EXHIBIT "A"

The land referred to in this Report is situated in the State of California, County of Placer, and is described as follows:

PARCEL ONE:

Beginning at the Southwest corner of the parcel described hereby, a point on the Easterly line of the California State Highway, said point being identical with the Northwest corner of the property described in that certain Deed to Rhoades, recorded in Volume 882, at page 24 of the Official Records of Placer County, and from said point, the stump of a fir tree marking the meander corner common to fractional Section 36, Township 15 North, Range 16 East, MDB&M and fractional Section 1, Township 14 North, Range 16 East, MDB&M, bears the following two consecutive courses: (1) South 02°39'40" West 160.00 feet and (2) South 07°40'40" West 1628.64 feet; thence along the Easterly line of the California State Highway on the following two consecutive courses: (1) North 02°39'40" for a distance of 98.99 feet , and (2) along the arc of a curve to the right having a radius of 3460 feet, through an angle of 02°54'53" for a distance of 176.01 feet ( said arc being represented by the chord of North 04°07'06.5" East 176.00 feet); thence South 75°07'35" East 338.00 feet; thence South 31°54'39" West 225.00 feet to a point on the North line of the parcel described in the above mentioned Deed to Rhoades; thence North 89°09'10" West along said North line for a distance of 225.00 feet to the point of beginning.

PARCEL TWO:

All that certain strip of land which lies between the East line of the above described parcel and the low water of Lake Tahoe and is bounded by the Easterly extensions of the Northerly and Southerly lines of said parcel.

APN: 085-250-008

EXHIBIT 1

RECORDING REQUESTED BY:
SIERRA VALLEY TITLE COMPANY
AND WHEN RECORDED MAIL TO:

CITIBANK, FSB C/O CITIMORTGAGE, INC.
PO BOX 9206, MS 81026
FARMINGTON HILLS, MI 48333-9206

PLACER, County Recorder
JIM MCCAULEY
DOC- 2004-0002629
Acct 77-SIERRA VALLEY TITLE
Monday, JAN 12, 2004 08:00:00
REC    $3.00 MIC    $3.00 AUT    $1.00
SBS    $0.00

Ttl Pd    $7.00    Nbr-0001008257
                          slk/SK/1-1

THIS SPACE FOR RECORDER'S USE ONLY:

ESCROW NO. DG-54506527-NM

TITLE ORDER NO. 506527

## FULL RECONVEYANCE

SIERRA VALLEY TITLE COMPANY, a Corporation, Trustee under the Deed of Trust executed by

**NATHAN L. TOPOL, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**

Trustor, and recorded DECEMBER 16, 2002 as Serial No. 2002-0125157 in Book n/a, Page n/a, of Official Records in the Office of the County Recorder of Placer County, California, having been requested in writing by the holder of the obligation secured by said Deed of Trust, to reconvey the estate granted to Trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust in the lands therein described, situated in the County of Placer, State of California reference being hereby specifically made to said Deed of Trust and the record thereof for a particular description of said lands.

IN WITNESS WHEREOF, said SIERRA VALLEY TITLE COMPANY, Trustee, has caused its corporate name and seal to be hereto affixed by its Assistant Secretary, thereunto duly authorized.

DATED January 2, 2004
STATE OF CALIFORNIA
COUNTY OF *Placer*
On *January 6, 2004*
before me, *Cari Lemos*
a Notary Public in and for said State, personally appeared
*Regina Kay Krahn*

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature

SIERRA VALLEY TITLE COMPANY

BY:
REGINA KAY KRAHN, ASSISTANT SECRETARY
BY:

CARI LEMOS
COMM. #1266731
Notary Public-California
PLACER COUNTY
My Comm. Exp. June 6, 2004

(This area for official notarial seal)

EXHIBIT 2

# EXHIBIT F

**Steve Harris**

| | |
|---|---|
| **From:** | Steve Harris |
| **Sent:** | Friday, September 05, 2014 2:08 PM |
| **To:** | ejimenez@piteduncan.com |
| **Cc:** | wdg@renotrustee.com |
| **Subject:** | Nathan Topol/ CitiMortgage |
| **Attachments:** | doc01781620140905130054.pdf |

Hi Eddie –

Please see enclosed letter for your immediate review.

Thank you,
Steve

# Stephen R. Harris, Esq.

## Harris Law Practice LLC

6151 Lakeside Drive, Suite 2100
Reno, NV 89511
775-786-7600

steve@harrislawreno.com

1

# HARRIS LAW PRACTICE, LLC

ATTORNEYS AND COUNSELORS AT LAW

STEPHEN R. HARRIS
LICENSED IN NEVADA

CHRIS D. NICHOLS
OF COUNSEL
LICENSED IN NEVADA & UTAH

6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511
(775) 786-7600
steve@harrislawreno.com

September 4, 2014

Via email ejimenez@piteduncan.com
Eddie R. Jimenez, Esq.
Pite Duncan, LLP
4375 Jutland Drive, Suite 200
San Diego, CA 92117

Re:    Nathan L. Topol – Chapter 7 case / CitiMortgage Claim Objection

Dear Eddie:

I am in receipt of the documents produced by CitiMortgage in response to the Subpoena issued by the Trustee on February 25, 2014. In that regard, I note that it is clear that all of the basic loan documents were not provided by CitiMortgage. We are aware that there were at least two loan modifications after the initial loan was made, and yet the loan modification documents were not provided other than one "Loan Modification Notice". None of the escrow instructions are included either, nor are other basic documents that would normally be part of a loan file. I trust that CitiMortgage will fully comply with the Subpoena by producing all of the loan documents as requested.

I also note that we were provided with loan "system notes" from September 19, 2007 through the present, but all loan notes from the inception of the loan through September 2007 were not provided. Emails were provided from late 2011 through the present, but there was absolutely no correspondence provided for any time periods prior to that time. A payment register was provided commencing March 3, 2007, but this loan was incurred on October 16, 2002. Where are the payment records for October 2002 through March 2007?

There is also some text that has been redacted in several places from the "system notes" after the current principal balance of $5,527,893.75 is stated. The text that was redacted from those system notes in those instances are not part of any privileged communication with an attorney, so why was the text redacted? Please provide us with unredacted documents that include that text. I have attached the documents with the questionable redaction for your review.

It also appears that there was a junior HELOC also held by Citibank at the time the original loan was made to Nathan Topol in October 2002, and the HELOC was subordinated to CitiMortgage's new first priority deed of trust. The Trustee is going to issue another Subpoena to request information on that loan, and may also request additional documents or information from CitiMortgage. Will you agree to accept service on behalf of Citibank/ CitiMortgage in that regard?

Lastly, CitiMortgage filed a notice several weeks ago that it intended to serve a Subpoena on Sierra Valley Title Company. If that Subpoena was ever served, can you please provide us with copies of all documents you received in response to that Subpoena.

Eddie R. Jimenez, Esq.
September 4, 2014
Page 2


        Thank you. We appreciate the documents that were provided by CitiMortgage thus far, but they are woefully incomplete relative to the scope of the Subpoena and the loan that the Subpoena addresses. I appreciate your cooperation in this matter.  As you recall, the evidentiary hearing on the Trustee's objection to CitiMortgage's claim is scheduled for January 15 and 16, 2015, so the Trustee requires timely compliance of any discovery requests. If we have any discovery disputes that need to be addressed, please let me know and we can arrange to bring the matter to Judge Beesley orally as he requested that we do.

                        Very truly yours,

                        /s/ Stephen R. Harris

                        STEPHEN R. HARRIS, ESQ.


SRH/ng
cc:  W. Donald Gieseke, Trustee (via email)

# EXHIBIT G

**Steve Harris**

| | |
|---|---|
| **From:** | Eddie R. Jimenez <ejimenez@piteduncan.com> |
| **Sent:** | Wednesday, September 10, 2014 3:57 PM |
| **To:** | Steve Harris |
| **Cc:** | wdg@renotrustee.com |
| **Subject:** | RE: Nathan Topol/ CitiMortgage |
| **Attachments:** | doc01781620140905130054.pdf |

Steve,

As you know, Judge Beesley ordered Citi to respond to the subpoena with the information that it had readily available. Accordingly, Citi provided information that it had available from 2007 to present. Citi believes that it has complied with the subpoena and with Judge's order, however, Citi is still in the process of attempting to obtain records from twelve years ago and will provide the responsive documents, if any, when available. I will follow up with my client regarding its efforts to obtain information from 2002 and provide a further status after I hear back from my client.

In your letter, you state that you "are aware that there were at least two loan modifications after the initial loan was made..". Please advise the dates of the loan modifications so I can confirm with my client and request the information.

The redacted text is protected by the word product privilege and is my client's internal impressions regarding the value of the property. Although privileged, I will inquire with my client if it is willing to waive the privilege and provide unredacted copies of the documents.

Please advise the relevance the HELOC referenced in your letter has to the Trustee's objection to claim? At this time, I am not authorized to accept service on behalf of Citi. However, if the Trustee does issue a subpoena on Citi, please provide me a courtesy copy. In the meantime, I will inquire into whether I am authorized to accept service on Citi's behalf.

The subpoena was served on Sierra Valley Title Company and I was advised that all records have been purged.

As for the scheduling order, I will also discuss with my client. However, working backwards from the evidentiary hearing date, we may not have enough time to conduct thorough discovery and also file dispositive motions prior to the evidentiary hearing dates of January 15th and 16th. I would like at least 60 to 90 days to complete discovery and then possibly file a motion for summary judgment prior to the evidentiary hearing. With a motion for summary judgment requiring thirty (30) days notice, I don't believe we will have enough time with the current schedule. It may be necessary to push the evidentiary hearing back to the end of February or March 2015. I will discuss with my client, but I wanted you to know my thoughts on the current time frame we are working under.

I look forward to hearing back from you regarding the requested loan modification dates and the relevance of the HELOC referenced in your letter to the Trustee's objection to claim.

**Eddie R. Jimenez**
*Partner*
**Pite Duncan, LLP**
Main Office: (858) 750-7600
Direct Dial: (858) 750-7612
Direct Fax: (619) 590-1385

1

ejimenez@piteduncan.com
www.piteduncan.com
**Arizona | California | Hawaii | Idaho | Nevada | Oregon | Texas | Utah | Washington**

**From:** Steve Harris [mailto:steve@harrislawreno.com]
**Sent:** Friday, September 05, 2014 2:08 PM
**To:** Eddie R. Jimenez
**Cc:** wdg@renotrustee.com
**Subject:** Nathan Topol/ CitiMortgage

Hi Eddie –

Please see enclosed letter for your immediate review.

Thank you,
Steve

# Stephen R. Harris, Esq.
## Harris Law Practice LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
775-786-7600

steve@harrislawreno.com

Visit our website at www.piteduncan.com

This message is intended for the use of the individual or entity to which it is addressed and may contain attorney/client information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email or by telephone (call us collect at 858/750-7600) and immediately delete this message and all its attachments. Thank you.

Federal law requires us to notify you that this communication is from a debt collector. Our office is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in an active bankruptcy case and/or received a bankruptcy discharge enjoining enforcement of your personal liability for this debt, our firm is not attempting to collect a debt from you personally on our client's behalf but may be entitled to pursue enforcement of our client's lien against their collateral to the extent permitted under applicable law. All included information is proprietary and confidential and is for the use of the intended recipient only.